# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

| | |
|---|---|
| **JAMES S. PAVLICHKO, SR.** : | |
| **Plaintiff,** : | |
| : | |
| **and** : | |
| : | |
| **JAMES S. PAVLICHKO, JR.,** : | |
| **A Minor Child** : | **CIVIL ACTION #:  02-cv-02889** |
| **Plaintiff,** : | |
| : | |
| **vs.** : | |
| : | |
| **GLEN MILLS SCHOOL,** *et al.* : | |
| **Defendants.** : | |

———————————————————————:

## MEMORANDUM OF LAW OF PLAINTIFFS
## IN OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiffs James Pavlichko, Sr. ("Pavlichko") and his son, James Pavlichko, Jr. ("Jim"),

by their undersigned counsel, hereby submit this response in opposition to Defendants' Motion

for Summary Judgment (the "Motion").  The Motion should be denied because, in arguing that

there are no genuine issues of material fact in this case, the Defendants ignore substantial

portions of the record that contradict their view of the events underlying this action.  When those

portions of the record unfavorable to the Defendants are considered, it is immediately apparent

that summary judgment is not proper in this case.  Moreover, the Defendants also miscast

important aspects of civil rights jurisprudence in this Circuit.

This litigation arises out of an assault on Jim while he was in a placement at Glen Mills

("Glen Mills"), and the repercussions thereof.  In brief, Jim was adjudicated delinquent by the

Court of Common Pleas of Luzerne County and eventually sent to Glen Mills for rehabilitation.

One night while there Defendant T.J. Green, one of the staff members, came into his room,

yelled at him at length, and finally slammed him into a wall and held him there for five minutes.

Thereafter, Jim informed his father of the assault. Pavlichko then sent a letter to Glen Mills officials, as well as public officials of the Commonwealth of Pennsylvania, questioning his son's treatment and requesting that they not retaliate against Jim because of Pavlichko's correspondence. Because of these letters, Glen Mills and its staff retaliated against Jim in numerous respects, including ultimately asking the court to remove him from the school.

The foregoing facts give rise to the Plaintiffs' claims against the Defendants for civil rights violations, assault and battery. In their Motion, the Defendants take the facts as testified by themselves and argue that, based on such characterization of the facts, Plaintiffs do not have valid claims. In doing so, they ignore the fundamental tenet of summary judgment law that the non-moving party need only "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). As set forth below, the record contains specific facts showing that there are genuine issues for trial as to each of Plaintiffs' claims.

Moreover, the Defendants mischaracterize Plaintiffs' claims and applicable civil rights law in arguing that the Plaintiffs cannot establish a claim under Section 1983. First, contrary to Defendants' assertions, they are state actors under established Third Circuit jurisprudence. Moreover, although the Defendants' actions, in isolation, may not have violated particular constitutional protections, their behavior as a whole in retaliation for Jim's and Pavlichko's complaints about Jim's treatment violate Plaintiffs' First Amendment rights. Accordingly, the Motion should be denied.

## COUNTERSTATEMENT OF FACTS[1]

On April 11, 2002, Defendant T.J. Green came into Jim's room and began to yell and curse at him and his roommate. (Pavlichko Jr. Dep. at 40:5-41:1.) Jim did not talk back to Green, let alone act belligerently in any way. (Pavlichko Jr. Dep. at 40:9-40:12, 41:16-42:6, 49:5-49:9.) All of a sudden, for no identifiable reason, Green "just grabbed [Jim] by [his] shirt and slammed [him] against the wall and started cursing in [his face.]" (Pavlichko Jr. Dep. at 42:11-42:14; *see also id.* at 47:22-48:1 ("But then he turned to me for some reason and started yelling at me and grabbed me by the shirt and slammed me against the wall and started yelling in my face.").) Green held Jim in that position for "about five minutes." (Pavlichko Jr. Dep. at 48:5-48:10.) As a result, Jim suffered injuries to his back and head. (Pavlichko Jr. Dep. at 58:1-60:24, 152:11-154:3.)

Shortly after the assault, Jim wrote to his father and told him what Green had done to him. (Pavlichko Jr. Dep. at 96:17-97:1.) Once Pavlichko learned what happened to his son, he wrote a letter on or about April 16, 2002 addressed to the Superintendent of Glen Mills, with copies to, among others, the Pennsylvania State Police and the Pennsylvania Department of Welfare. (Ex. E.) In that letter, Pavlichko repeated what he had learned from his son and directed both that his son should no longer be subjected to the physical and verbal abuse he had suffered at Glen Mills and that his son should not be retaliated against or punished in any way for

---

[1] The deposition excerpts and other documents referenced herein are attached as exhibits to the Declaration of Matthew A. Hamermesh in Opposition to Defendants' Motion for Summary Judgment. Deposition excerpts are cited herein by the name of the deponent and page and line numbers. Other documents are identified by exhibit number in the declaration.

Solely for purposes of the Defendants' Motion for Summary Judgment, Plaintiffs agree to the facts as stated in Defendants' Memorandum of Law in Support of Motion for Summary Judgment, except to the extent contradicted herein.

raising these issues.  (Ex. E.)  As a result of Jim's publicized allegations, the Department of

Public Welfare ("DPW") initiated an investigation into the incident.  (Ex. J.)[2]

In the two months after Glen Mills became aware of Jim's complaints to his father about

Green's assault of him, Jim was treated differently by Glen Mills staff than he had been prior to

these complaints.  First, Jim was transferred from Taylor Hall, where he had been assigned since

he arrived at Glen Mills in September 2001, to Tyler Hall.  (Pavlichko Jr. Dep. at 62:14-62:17.)

Jim testified that he was told he was being transferred to Tyler Hall because his dad was creating

problems.  (Pavlichko Jr. Dep. at 63:1-63:10.)  Similarly, the unit logs for Tyler Hall state that

Jim was being transferred because his father had falsely accused Taylor Hall's staff of not

servicing Jim properly as well as because of an incident wherein Jim had been listening to a

radio after hours.  (Ex. H.)

After Jim was transferred, James Welsh, the team leader at Tyler Hall, took Jim's mail

and the paperwork he had received from Pavlichko and refused to allow him access to them.

(Pavlichko Jr. Dep. at 89:20-90:7, 104:4-104:13.)  While Jim was at Tyler Hall, he continued to

participate in Glen Mills' activities and program; as the Comprehensive Report dated June 12,

2002 showed, Jim needed improvement in certain areas but was in other ways responding

favorably to the program.  (Ex. F.)  As of June 12, Glen Mills recommended that Jim remain in

placement there.  (Ex. F.)

Prior to Jim's review hearing on June 17, 2002, Nelson Yanez, the admissions director at

Glen Mills, received information concerning Jim from Glen Mills staff who interacted with Jim

---

[2]  After conducting its investigation, on or about June 7, 2002, DPW declared the abuse
allegation was "unfounded" because "[t]he child did not suffer severe pain, nor was his/her
physical functioning temporarily or permanently impaired" and therefore the alleged abuse did
not meet the state's definition of "serious physical injury."  (Ex. J.)  The report did not render a
conclusion on whether Jim had in fact been shoved into a wall by Green.

regularly.  (Yanez Dep. at 43:7-44:7, 48:5-48:17.)  He also received and reviewed a copy of the

Third Comprehensive Report, dated June 12.  (Yanez Dep. at 63:21-64:1.)  He communicated

with Sadie Cole, Jim's probation officer from Luzerne County, about Jim's behavior at Glen

Mills.  (Yanez Dep. at 79:13-80:22.)  At that point, Cole said she did not know whether the court

would continue Jim's placement at Glen Mills or remove him from that program.  (Yanez Dep. at

86:9-87:1.)

In spite of the June 12 report recommending that Jim stay at Glen Mills, a unit log entry

dated June 16, 2001, the day before his review hearing, stated that "[Jim] will be discharged

tomorrow."  (Ex. I.)  At that hearing, Judge Ciavarella remarked that it was his understanding

that "Glen Mills no longer wants [Jim] in their program."  (Ex. G.)  Judge Ciavarella then

removed Jim from Glen Mills.  (Ex. G.)  Jim was sent to the juvenile detention facility for

Luzerne County (Pavlichko Jr. Dep. at 125:24-126:5), and was eventually transferred to a

placement at Northwestern Academy in Coal Township, Pennsylvania.  (Pavlichko Jr. Dep. at

9:7-9:12.)

## ARGUMENT

## I.    THE DEFENDANTS ARE STATE ACTORS UNDER SECTION 1983

The Defendants' assertion in their Motion that they are not state actors is incorrect.  In so

arguing, Defendants rely on *Robert S. v. Stetson School, Inc.*, 256 F.3d 159 (3d Cir. 2001).  Such

reliance is entirely misplaced.  *See C.K. v. Northwestern Human Services*, 255 F. Supp. 2d 447

(E.D. Pa. 2003) (distinguishing *Robert S.* and finding state action on facts similar to those of this

case).

*Robert S.* is plainly distinguishable from this case.  The juvenile in that case was placed at

Stetson School – a private school for troubled children – by his legal custodian.  *See Robert S.,*

256 F.3d at 166-67.  The court concluded that the school was not a state actor.  Simply because

his legal custodian was the Department of Human Services did not mean that his situation was analogous to "a prisoner or person who has been involuntarily civilly committed." *Id.* The court further distinguished a case from the Tenth Circuit, in which that court found state action at a school to which delinquent children were sent by juvenile courts. *See id.* (discussing *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982)).

In this case, by contrast, Jim was sent to Glen Mills as a juvenile delinquent by the Court of Common Pleas of Luzerne County. (Defendants' Br. at 7.) Thus, his situation is precisely that which the court in *Robert S.* distinguished in concluding that there was no state action in that case. *Cf. Robert S.*, 256 F.3d at 166-67. Indeed, the court in *Robert S.* went to great pains to emphasize that "[a]t no time . . . did a court find [the child at issue in that case] to be a 'delinquent child.'" *Robert S.*, 256 F.3d at 162.

Rather, this case is similar to the situation in a recent decision by Judge Bartle of this Court. *See C.K. v. Northwestern Human Servs.*, 255 F. Supp. 2d 447 (E.D. Pa. 2003) (Bartle, J.). In *C.K.*, a child was adjudicated a juvenile delinquent by the Court of Common Pleas of Luzerne County and sent to Northwestern Academy[3] for treatment. While there, she was subjected to abuse. Judge Bartle distinguished *Robert S.* and concluded that the defendants in *C.K.* were state actors:

> Northwestern Academy and its employees had custody of C.K., a delinquent child, pursuant to a court order when she was allegedly sexually assaulted by a Northwestern Academy employee. C.K. had been found to be a delinquent because she committed "an act designated a crime under the law of th[e] Commonwealth." 42 Pa. Cons. Stat. Ann. § 6302. The purpose of her commitment was rehabilitation, one of the generally accepted

---

[3] Indeed, Jim has at spent time at Northwestern Academy as well. Fortunately, and unlike while he was at Glen Mills, he was not subjected to abuse while at Northwestern Academy.

> goals of confinement.  Northwestern Academy, even though a
> private corporation, and its employees, were clearly exercising
> power that is "traditionally exclusively reserved to the State."
> *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 (1978) (citation
> omitted).  They were performing a function "quintessentially
> governmental."  *Stetson*, 256 F.3d at 167 n. 9.

*C.K.*, 255 F. Supp. 2d at 451.  The facts of this case are identical in all relevant respects.

Glen Mills is indisputably providing a function "traditionally exclusively reserved to the

State."  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 157 (1978); *see also Robert S.*, 256 F.3d at

165 (discussing whether defendant "performed a function that has traditionally been the

exclusive province of the state").  Glen Mills provides treatment for juveniles adjudicated

delinquent by courts throughout the country.  (Defendants' Br. at 3.)  Treatment of juvenile

delinquents is a function traditionally within the exclusive domain of the state.  *See C.K.,* 255 F.

Supp. 2d at 451

Moreover, Jim was an "involuntary" resident of Glen Mills.  In *Robert S.*, the court

concluded that the child at issue was not an involuntary resident of the Stetson School because

"his legal custodian, DHS, wanted him placed there, and his mother consented."  *Robert S.,* 256

F.2d at 157.[4]  Here, by contrast, Jim was sent to Glen Mills involuntarily as an adjudicated

juvenile delinquent.  Thus, this case is readily distinguishable from *Robert S.*, and the Defendants

are state actors under Section 1983.

---

[4] The Defendants inaccurately assert that the child in *Robert S.* was sent to the Stetson
School "pursuant to juvenile court orders issued under the Juvenile Act."  (Defendants' Br. at
14.)  In fact, as set forth in the text and emphasized by the court in that case, the child in *Robert
S.* was sent there by his legal custodian, not any court.

## II.   PLAINTIFFS HAVE DEMONSTRATED A DEPRIVATION OF A FEDERALLY-PROTECTED RIGHT

Defendants baldly assert that Plaintiffs have failed to show a deprivation of a constitutionally-protected right, then proceed to list the various adverse actions that Defendants took against Jim and argue that none of these individual actions constitute a violation of a federally-protected right.  (Defendants' Br. at 12-14.)  Looking at these actions in a vacuum, Defendants may be correct that they do not constitute violations of constitutional rights. Plaintiffs have not argued that.  Instead, Plaintiffs contend that these actions were taken in retaliation against Jim for exercising his rights to freedom of speech and freedom of association, and that, as a result, these actions do violate his constitutionally-protected rights under the First Amendment of the United States Constitution.  Contrary to Defendants' assertions, and as demonstrated more fully below, there is a genuine issue of material fact as to whether the Defendants retaliated against Jim for engaging in protected activity.

Defendants correctly "anticipate" that plaintiffs are alleging a First Amendment retaliation claim against them.  (Defendants' Br. at 15.)  This is particularly so since, in Count I of the Complaint, captioned "42 U.S.C. § 1983 – Retaliation," Plaintiffs allege that: (1) they engaged in protected activity by complaining about the abuse, (2) Defendants subjected Jim to adverse treatment, and (3) Plaintiffs' protected activity in complaining about the abuse was a substantial factor in Defendants' adverse treatment of Jim.  (Compl. ¶¶ 49-51.)  Plaintiffs have identified evidence supporting each element of its allegations that Defendants violated Jim's constitutionally-protected entitlement to be free from retaliation for exercising his First Amendment rights, and there is a genuine dispute about the material facts underlying this claim that precludes the entry of summary judgment in favor of Defendants.

The elements for a First Amendment retaliation claim are not in dispute: "To prove that the defendants violated [a plaintiff's] First Amendment rights by retaliating against him for filing complaints, [the plaintiff] must show: (1) that [he] engaged in protected activity; (2) that the [state actor] responded with retaliation; and (3) that the protected activity was the cause of the retaliation." *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (citing *Anderson v. Davila,* 125 F.3d 148, 161 (3d Cir.1997)). Defendants incorrectly assert that Plaintiffs cannot demonstrate any of the required three prongs to establish a First Amendment retaliation claim.

### A.    Plaintiffs Engaged In Protected Activity Under the First Amendment

Defendants first argue that Jim cannot seek redress for a violation of his First Amendment rights because it was his father whose speech resulted in the retaliation, not Jim's. Contrary to Defendants' assertions, however, it is Jim's First Amendment rights that were implicated as a result of his father's complaints. The whole dispute was triggered by Jim's complaints to his father, who merely related them to the school. This implicates both Jim's right to speak out on a matter of public concern as well as to associate with his father to jointly address the issue. Thus, contrary to Defendants' assertions, Jim has engaged in protected activity under the First Amendment.

In a similar case, *Cain v. Tigard-Tualatin School District 23J*, 262 F. Supp. 2d 1120, 1123-24 (D. Or. 2003), a high school student and his parents brought a complaint alleging that the high school football coach retaliated against the student after the student's parents complained about the coach's mistreatment of the student. The defendants argued in essence that the First Amendment could not violated by retaliating against one person for speech made by third parties. *Cain*, 262 F. Supp. 2d at 1127. As the court noted, "[t]he First Amendment protects not only a citizen's right to speak freely but also his or her right to associate freely with other speakers of similar opinions." *Id.* More specifically, the court found that "[t]here are few

9

associational rights more intimate and fundamental than the right of a minor child to associate

with his parents who are engaged in protective speech made on the child's behalf." *Id.* For

similar reasons, Jim's complaints, as conveyed though his father, should qualify as protected

activity under the First Amendment.

      If, however, this court decides that Jim cannot base his claim on his own protected

conduct, he should, in light of the circumstances, have third-party standing to assert a claim for

the injuries he suffered as a result of a violation of his father's constitutional rights.  To

determine whether a party can assert third-party standing:

> the court must examine the relationship between the plaintiff and
> the third party whose rights are asserted; second, the court must
> consider the ability of the third party to advance its own rights--
> whether some obstacle impedes the rightholder's own suit; and
> third, the court must inquire into the impact on third party
> interests--whether the plaintiff and the third party have consistent
> interests.

*Amato v. Wilentz,* 952 F.2d 742, 749 (3d Cir. 1991).  There is ample evidence in the record to

support Jim's assertion of his rights based on his father's protected activity.

      Numerous courts have recognized that the parent-child relationship is sufficiently close to

satisfy the first requirement for third-party standing.  *See, e.g., Lewis v. Thompson*, 252 F.3d 567,

585 (2d Cir. 2001); *Hutchins by Owens v. District of Columbia*, 144 F.3d 798, 803 (D.C. Cir.

1998); *Lindley ex rel. Lindley v. Sullivan,* 889 F.2d 124, 129 (7th Cir. 1989); *Johnson v. City of*

*Opelousas,* 658 F.2d 1065, 1069 (5th Cir. 1981); *see also Serena H. v. Kovarie*, 209 F. Supp. 2d

453 (E.D. Pa. 2002).  Jim, as many children do, turned to his natural father when he was

mistreated and his father, as many fathers do, took up Jim's cause and complained to Glen Mills

on Jim's behalf.  Although Pavlichko voluntarily transferred guardianship of Jim to Jim's

paternal grandparents, Defendants have offered no legal support for their contention that Jim

should have relied upon his grandparents, rather than his father, to act on his behalf; moreover,

the evidence showed that Jim's grandparents asked their son to assist in getting more information about the incident, and, once he obtained this additional information, Pavlichko contacted the school about these allegations.  (Pavlichko Sr. Dep. at 21:9-21:17.)  There is no reason that Jim's father could not and should not have spoken out on his son's behalf as he did.  Thus, the relationship between Jim and his father satisfies the first-prong for prudential standing.

Defendants further assert that Jim could have complained about the abuse for himself, utilizing the student grievance process.  The evidence does not demonstrate that Jim even knew this was an option for him, as he testified that he understood the grievance process to relate to complaints against other students, and was unaware of any protected "student rights" at the school.  (Pavlichko Jr. Dep. at 93:18-94:19.)  Indeed, Jim testified that he did not receive the copy of the student handbook that Defendants relied upon to show that he should have known about the grievance policy.  (Pavlichko Jr. Dep. at 92:13-92:23.)  In light of the above, this court should find that Jim was not capable of asserting his rights as effectively as his father and that this factor further supports finding that Jim could assert third-party standing to bring his claim.

Finally, Jim has presented record evidence to demonstrate that he suffered an injury as a result of his father's speech.  Jim has testified that, after his father complained about the assault, Jim was transferred to a new hall, had his mail and documents related to the abuse complaints confiscated, and eventually was removed from Glen Mills, even though those people responsible for monitoring Jim's development recommended that he stay in the program.  Jim believes this ultimately delayed his release from the juvenile system.  (Pavlichko Jr. Dep. at 61:1-61:17.)  These injuries were all a result of his father's speech.  Thus, either on his own or through his father, the evidence demonstrates that Jim has engaged in protected activity and that he has satisfied the requirements for a First Amendment retaliation claim.

**B.    Plaintiffs Have Proffered Evidence That Glen Mills And Certain Individual Defendants Took Action In Retaliation For Plaintiffs' Exercise Of Protected Rights Under The First Amendment**

Defendants next argue that there is no evidence that any individual defendants took adverse actions against Jim following his complaints of abuse.  With regard to each individual defendant:

**T.J. Green.**  Jim acknowledged that, after he was assaulted by Green, he had no further substantive contact with Green.  (Pavlichko Jr. Dep. at 64:4-64:16.)  Discovery did not uncover any evidence to show that Green took any action in retaliation against Jim or participated in any of the adverse treatment of Jim taken in response to his complaints.  Thus, plaintiffs will agree to dismiss the First Amendment retaliation claims against Green under 42 U.S.C. § 1983.  As demonstrated below, however, plaintiffs have offered more than enough evidence to survive a motion for summary judgment on their claims for both cruel and unusual punishment under the Eighth Amendment of the United States Constitution and state-law assault and battery, and those claims against Green should not be dismissed.

**James Welsh.**  With regard to Welsh, although Welsh denies confiscating Jim's mail when Jim was transferred from Taylor Hall to Tyler Hall, Jim testified that Welsh took the mail and paperwork he had received from Pavlichko and refused to allow him access to these documents.  (Pavlichko Jr. Dep. at 89:20-90:7, 104:4-104:13.)  There is a genuine issue of material fact over whether Welsh did or did not confiscate Jim's mail and refuse to permit him access to it.  Thus, there is a genuine issue of material fact as to whether Welsh took adverse action against Jim because of Pavlichko's letters, and defendant Welsh is not entitled to summary judgment on Plaintiffs' First Amendment retaliation claim.

**Nelson Yanez.**  Defendants assert that Yanez never requested that Jim be removed from Glen Mills, yet all the evidence shows that up until a few days before his placement review

12

hearing, Glen Mills was recommending that Jim remain in placement there.  Thus, it seems odd

that, if Glen Mills was recommending Jim remain in placement, Judge Ciavarella would begin

Jim's placement review hearing by saying that Glen Mills wants Jim removed.  (Ex. G)  More

striking, then, was Yanez's complete acquiescence in Judge Ciavarella's characterization of Glen

Mills' position.

Immediately prior to Jim's nine-month review hearing on June 17, 2002, it was unclear

whether he would remain in his placement at Glen Mills.  Yanez testified that, based on his

review of Jim's progress reports, it is his personal opinion that Jim should have stayed in

placement at Glen Mills.  (Yanez Dep. at 77:2-77:18.)  The Third Comprehensive Report for

Jim, dated only a week before his hearing, concurred in recommending that Jim should remain at

Glen Mills.  (Ex. F.)  Indeed, that report would have been sent to Sadie Cole, Jim's probation

officer, and Yanez testified that, when he spoke to her prior to the review hearing, he reiterated

the recommendation that Jim remain at Glen Mills.  (Yanez Dep. at 82:14-82:25.)  According to

Yanez, Cole told him that she did not know whether Jim would be discharged from Glen Mills

after the review hearing and that he personally did not know what would happen to Jim at the

review hearing.  (Yanez Dep. at 86:9-87:1.)

And yet, for all that, a unit log entry dated June 16, 2001 – *the day before Jim's review

hearing* – states that "[Jim] will be discharged tomorrow."  (Ex. I.)  As noted above, at the

beginning of the hearing, Judge Ciavarella began by stating that "[m]y understanding is that Glen

Mills no longer wants you in their program."  (Ex. G.)  Yanez did not dispute that

characterization – on the contrary, Yanez explained to Jim and the Court that Jim was "buying

into some of the behaviors and making comments such as alleging mistreatment to DPW."  (*Id.*)

Thus, there is evidence that would support plaintiffs' allegations that Yanez furthered Glen

13

Mills' agenda in seeking to have Jim removed from the school for his publicized complaints of abuse at the hands of the school, and that the motion for summary judgment should be denied as to defendant Yanez.

**Cosimo D. Ferrainola, Larry Laurence, Greg Frazier and Todd Donahue.** In light of the evidence that Ferrainola was not actively involved in the day-to-day management of Glen Mills during the time that Jim was abused by Green and later retaliated against for complaining about it, Plaintiffs will agree to dismiss Ferrainola individually. Likewise, with regard to Laurence, Frazier, and Donahue, discovery has not produced sufficient evidence to support Plaintiffs' allegations of retaliation or conspiracy against these three individuals. Accordingly, Plaintiffs will agree to dismiss these three individual defendants from the instant lawsuit.

**C.  Plaintiffs Have Offered Evidence That The Adverse Treatment Against Jim Was In Retaliation For His Allegation Of Assault Against A Glen Mills Employee**

Finally, Defendants assert that "any conduct related to the Plaintiff was not the result of any retaliation of Defendants." (Defendants' Br. at 20.) Instead, it was, according to Defendants, the result of Jim's own disruptive conduct. Jim, however, denies that he personally said that he was "untouchable," although he acknowledged that another Glen Mills student attributed this comment to him on one occasion. (Pavlichko Jr. Dep. at 117:12-119:16.) Thus, there is a genuine issue of material fact about the conduct that Defendants allege resulted in Jim's removal from Glen Mills.

Other evidence, however, shows that it was in fact his complaints, and not Jim's alleged "untouchable" comment, that led to the adverse treatment of him. The unit log for Tyler Hall shows that one of the reasons for the transfer was Pavlichko's "false" accusations against Taylor Hall staff. Jim alleges that the only mail and documents that were taken from him were those related to his complaints of abuse. And his removal from Glen Mills less than a week after it

was recommended to the reviewing court in Luzerne County that he remain at the facility seems

suspect if his only behavioral problem was calling himself "untouchable" and resisting

confrontation.  Thus, there is both direct and circumstantial evidence that Jim was retaliated

against for Plaintiffs' protected conduct.  This evidence creates a genuine issue of material fact

on the issue of retaliation and Defendants' motion for summary judgment as to defendants Glen

Mills, Yanez, and Welsh on Plaintiffs' First Amendment retaliation claims should be denied.

**III.    THE DEFENDANTS VIOLATED JAMES PAVLICHKO, JR.'S RIGHTS UNDER
THE EIGHTH AMENDMENT BY ASSAULTING AND BATTERING HIM**

Although the Defendants accurately state the legal standard for determining whether an

Eighth Amendment violation occurred, (Defendants' Br. at 22 (quoting *Brooks v. Kyler*, 204

F.3d 102 (3d Cir. 2000)), they completely ignore the evidence in the record and the applicable

summary judgment standard in arguing that no Eighth Amendment violation occurred in this

case.  Relying exclusively on the testimony of the defendant, T.J. Green, Defendants assert:

> Here, there in nothing in the record that T.J. Green's
> conduct was anything but a good-faith effort to maintain and
> restore discipline in Tyler Hall on April 11, 2002.  Here, T.J.
> Green manually assisted James Pavlichko, Jr.  Under the Glen
> Mills Student Handbook, the sole purpose of a "manual assist" is
> to provide the student with a final attempt to gain self-control.  Mr.
> Green's deposition testimony indicates that Plaintiff became very
> belligerent immediately before the manual assist.  There is nothing
> in the record to show that Mr. Green maliciously and/or
> sadistically caused harm to Plaintiff. . . .  There is no evidence to
> show that Mr. Green used force on Plaintiff in a malicious or
> sadistic effort to injure him.  The contact between Mr. Green and
> Plaintiff lasted only a few seconds and the situation was diffused
> shortly thereafter.  As a result, there is nothing in the record to
> demonstrate an Eighth Amendment violation . . . .

(Defendant's Br. at 22-23.)

Defendants' description of events and the record completely ignores the deposition testimony of Jim himself. Contrary to Defendants' assertions, there is evidence in the record that:

- Jim did not lose control or act belligerently. (Pavlichko Jr. Dep. at 40:9-40:12, 41:16-42:6, 49:5-49:9.) Indeed, Green testified at his deposition that Jim was only verbally belligerent, and not physically threatening. (Green Dep. at 54:25-55:5.) Green thus had no need to use a "manual assist" to maintain or restore discipline.

- Green did more than "manually assist" Jim. The Glen Mills Student Handbook states: "The manual assist shall be conducted by staff placing their hands on the student's arm or shoulder area only and shall not exceed one minute." (Ex. K at 42.) Clearly, this does not include pushing a student or slamming him into the wall. Indeed, Green himself testified that pushing a student into a wall was more than a manual assist. (Green Dep. at 54:1-54:18.)

- The incident lasted substantially longer than a few seconds, as asserted by the Defendants. (Pavlichko Jr. Dep. at 48:5-48:10 (Green held Jim against the wall for "about five minutes").)

- As a result of Green's actions, Jim suffered injuries to his back and head. (Pavlichko Jr. Dep. at 58:1-60:24, 152:11-154:3.)[5]

- Green's actions were malicious, as one can conclude from the fact that he had no reason for slamming Jim into the wall.

This evidence demonstrates the existence of genuine issues of material fact as to whether Green acted "maliciously and sadistically to cause harm," or rather, as Defendants claim, "in a good-faith effort to maintain or restore discipline." (*See* Defendants' Br. at 22.) A review of the five factors set forth in *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000), shows that Green used excessive force.

---

[5] Oddly, Defendants cite page 58 of Jim's deposition to support the assertion that "Plaintiff even testified that he did not sustain any type of injury. James did not feel any pain or suffer any injuries." (Defendants' Br. at 22.) On that page, however, Jim describes how he suffered an injury to his head, and later describes ongoing back pain as a result of the incident. (Pavlichko Jr. Dep. at 58:1-60:24.)

- Per Jim's testimony, there was no need to use force, as Jim was not talking back or acting belligerently.

- Since there was no need to use force, the force used was ipso facto disproportionate to the need.

- Jim suffered injuries as a result of the incident. *Cf. Brooks*, 204 F.3d at 108 ("[T]he absence of significant resulting injury is not a per se reason for dismissing a claim based on alleged wanton and unnecessary use of force . . . ."); *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002).

- There is no evidence in the record that Jim was any threat to staff or other inmates at Glen Mills. (Green Dep. at 54:25-55:5 ("Q: And was he being physically belligerent during this incident at all? . . . . A: No.").)

- The record evidence supports the conclusion that Green made no effort to temper the force of his actions.

*Cf. Brooks*, 204 F.3d at 106. Accordingly, Plaintiffs' Eight Amendment claim should not be dismissed. *See Smith*, 293 F.3d at 649 (weighing of *Brooks* factors is issue for finder of fact).

## IV.    THE RECORD CONTAINS SUFFICIENT EVIDENCE TO SUPPORT ASSAULT AND BATTERY CLAIMS

In seeking dismissal of the assault and battery claims, Defendants again rely on a one-sided and misleading view of the record. The Defendants discount Jim's testimony about what happened, while ignoring his description of his injuries that resulted from the incident. To the contrary, the evidence in the record is more than sufficient to support claims for assault and battery.

> To prove [a] claim of assault, under Pennsylvania law, Plaintiff must show that a particular Defendant intentionally caused an imminent apprehension of a harmful or offensive bodily contact in Plaintiff. To prove [a] claim of battery, Plaintiff must establish that a particular Defendant intended to cause a harmful or offensive contact to Plaintiff, or an imminent apprehension of such contact in Plaintiff, and that such contact with Plaintiff resulted.

*Lakits v. York*, 258 F. Supp. 2d 401, 407 (E.D. Pa. 2003) (citations omitted); *see also Renk v. City of Pittsburgh*, 537 Pa. 68, 76, 641 A.2d 289, 293 (1994) ("Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person.") (quoting *Cohen v. Lit Bros.*, 166 Pa. Super. 206, 209, 70 A.2d 419, 421 (1950)).

As Jim testified, Green "just grabbed [Jim] by [his] shirt and slammed [him] against the wall and started cursing in [his face.]"  (Pavlichko Jr. Dep. at 42:11-42:14; *see also id.* at 47:22-48:1 ("But then he turned to me for some reason and started yelling at me and grabbed me by the shirt and slammed me against the wall and started yelling in my face.").)  Slamming someone into a wall is undoubtedly a harmful and offensive contact which can only be intended to be harmful or offensive.  Moreover, it in fact caused Jim harm.  (Pavlichko Jr. Dep. at 58:1-60:24, 152:11-154:3.)  *Cf. Montgomery v. Bazaz-Sehgal*, 742 A.2d 1125, 1131 (Pa. Super. Ct. 1999) (whether the contact actually caused a physical injury is irrelevant to the determination of whether a battery occurred).  In addition, per Jim's testimony, Green's actions constituted an assault.  Such actions undoubtedly caused, and were intended to cause, Jim to fear that Green would cause imminent harmful or offensive bodily contact.  Accordingly, Plaintiffs have offered sufficient evidence to withstand Defendants' Motion, and the assault and battery claim should not be dismissed.

## V.    PLAINTIFFS HAVE OFFERED SUFFICIENT EVIDENCE OF EGREGIOUS AND OUTRAGEOUS CONDUCT TO SUPPORT AN AWARD OF PUNITIVE DAMAGES

Plaintiffs seek punitive damages against the individual defendants for their retaliation against Jim for exercising constitutionally-protected rights and against Green for his tortious assault on Jim.  Although Defendants assert that the evidence shows that their conduct does not "rise to the level of punitive damages" (Defendant's Br. at 25), they drastically understate how

egregious their alleged conduct was.  Based on the evidence marshaled by the plaintiffs, a jury could find that Green slammed James into a wall for listening to a walkman radio after hours and that, when Jim complained about this assault, he was punished by the Defendants and eventually removed from Glen Mills.  This type of conduct – all the more terrible because it occurs in an environment that is supposed to foster juveniles – is precisely the type of conduct that should be punished now and deterred in the future by punitive damages.

With regard to the federal claims, although Defendants seem to offer two different standards of conduct for punitive damages (*see* Defendants' Br. at 24), it is clear that only the second standard – and the less difficult to prove – must be established for punitive damages. "Punitive damages are available in actions brought pursuant to 42 U.S.C. § 1983 not only where there was a malicious intent or evil motive, but also where the defendants acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.'"  *Bennis v. Gable*, 823 F.2d 723, 734 (3d Cir. 1987) (quoting *Smith v. Wade,* 461 U.S. 30, 33, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983)); s*ee also Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir. 1996); *DeBellis v. Kulp*, 166 F. Supp. 2d 255, 282 (E.D. Pa. 2001).  Courts have, in the past, found that punitive damages were appropriate when the plaintiff alleged retaliation for exercise of his First Amendment rights.  *See, e.g., Tate v. Dragovich*, No. Civ. A. 96-4495, 2003 WL 21978141, at *7 (E.D. Pa. Aug 14, 2003) (Schiller, J.) (award of $10,000 in punitive damages for retaliatory conduct); *Feldman v. Philadelphia Housing Auth.*, No. Civ. A. 91-5861, 1993 WL 404094, at *9-*10 (E.D. Pa. Sep. 16, 1993) (Yohn, J.) (plaintiff awarded punitive damages for termination that was in retaliation for protected speech), *aff'd*, 43 F.3d 823 (3d Cir. 1999).

Here, Plaintiffs allege that, after Jim complained to his father about physical and verbal abuse he suffered at Glen Mills and his father repeated those complaints to state officials, Glen

Mills employees, among other things, confiscated Jim's mail concerning the abuse allegations and arranged to remove him from Glen Mills, even though only a week before his hearing his team leader recommended he remain at Glen Mills. "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Allah v. Al-Hafeez*, 226 F.3d 247, 252 (3d Cir. 2000) (quoting *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n.9, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986)). If Plaintiffs prove their allegations, Defendants' conduct in attempting to punish a juvenile committed to Glen Mills' care for complaints about physical abuse by a member of its staff should not only be punished, but punitive damages would clearly be warranted to deter any future instances of such egregious conduct.

For the state-law claims, punitive damages may be awarded where the conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others. *See Jahanshahi v. Centura Dev. Co., Inc.*, 816 A.2d 1179, 1188 (Pa. Super. 2003) (quoting *Johnson v. Hyundai Motor America,* 698 A.2d 631 (Pa. Super. 1997)). Jim alleges that, for listening to a Walkman after hours, Green grabbed him by the shirt and physically slammed him up against the wall. (Pavlichko Jr. Dep. at 23:23-24:9, 36:24-37:5, 42:7-42:14.) The record evidence shows that, at the time of the incident, Jim was approximately 5 feet, nine inches tall and weighed approximately 120 pounds; Green stands over six feet tall and outweighs Jim by more than 100 pounds. (Pavlichko Jr. Dep. at 42:20-43:1.) A jury could easily decide that such conduct by Green, particularly in light of the size difference between the two and the nature of what Jim had done wrong, was sufficiently "malicious" or "reckless" to warrant punitive damages. Moreover, an award of punitive damages would be appropriate to deter Green from resorting to force without adequate justification in the future. *See Judge Tech. Svcs., Inc. v.*

*Clancy*, 813 A.2d 879, 890 (Pa. Super. 2002) (purpose of punitive damages is to both punish and deter); *Feingold v. SEPTA*, 517 A.2d 1270, 1276 (1986) (same). Thus, Plaintiffs' claim for punitive damages should not be dismissed at this juncture, but instead should be an option for the jury to consider at the time of trial.

## CONCLUSION

As set forth above, the Defendants' Motion for Summary Judgment is fundamentally flawed. On the one hand, it relies on a one-sided view of the record that cannot properly form the basis for summary judgment. On the other hand, the Defendants misanalyze applicable civil rights law in arguing that the Plaintiffs have not offered evidence to support a claim under Section 1983. Accordingly, the Motion should be denied.

Respectfully submitted,

HANGLEY ARONCHICK SEGAL & PUDLIN

Dated: September 9, 2003                    By:_____
                                                Bruce S. Haines
                                                Kathleen M. Laubenstein
                                                Matthew A. Hamermesh
                                                One Logan Square, 27th Floor
                                                Philadelphia, PA 19103
                                                Telephone: (215) 568-6200
                                                Facsimile: (215) 568-0300

                                                *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Matthew A. Hamermesh, hereby certify that on September 9, 2003, I caused a true and

correct copy of the foregoing Memorandum of Law of Plaintiffs in Opposition to Defendants'

Motion for Summary Judgment to be served on the following by overnight mail:

> Edward M. Galang, Esquire
> Marshall, Dennehey, Warner, Coleman & Goggin
> One Montgomery Plaza, Suite 1002
> Norristown, PA 19401-4814
>
> Guy Vilim, Esquire
> Gold & Vilim
> 1608 Walnut Street
> Suite 1600
> Philadelphia, PA 19103

_____

Matthew A. Hamermesh