IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES S. PAVLICHKO, SR.,           :        NO. 2:02-cv-2889-WY
as guardian ad litem for           :
minor child,                       :
JAMES S. PAVLICHKO, JR.,           :
              Plaintiff            :
                                   :
        VS.                        :
                                   :
                                   :
GLEN MILLS SCHOOL,                 :
COSIMO D. FERRAINOLA, DIRECTOR,    :
LARRY LAURENCE, COUNSELOR,         :
GREG FRAZIER, STAFF MEMBER,        :
JIM WELSH, STAFF MEMBER,           :
TODD DONAHUE, STAFF MEMBER,        :
T.J. GREEN, STAFF MEMBER,          :
MR. YANEZ, STAFF MEMBER,           :
              Defendants           :

<u>MEMORANDUM AND ORDER</u>

    CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

        In the matter currently pending before this Court,
plaintiff James S. Pavlichko, Jr. (Pavlichko Jr.), and his father
and guardian <u>ad</u> <u>litem</u>, James S. Pavlichko, Sr. (Pavlichko Sr.),
allege multiple civil rights and state law claims against the Glen
Mills School ("Glen Mills" or the "school") and several of its
personnel regarding disciplinary action taken against Pavlichko Jr.
while in their custody.  Faced with an impending trial, defendants
now move for summary judgment, claiming that there are no genuine
issues of material fact for trial.  Having read and considered both
parties' arguments, the Court grants summary judgment in part and
denies it in part.

I.   FACTUAL BACKGROUND

At the time the complaint was filed in December of 2002, Pavlichko Jr. was seventeen years old. (Def. Exhibit A, at ¶ 2-3). He is the natural son of Pavlichko Sr., who was appointed guardian ad litem for Pavlichko Jr. in this action. Id. at ¶ 4. Legal custody of Pavlichko Jr., however, has belonged to his grandparents, Michael and Mary Pavlichko, since 1998 due to Pavlichko, Sr.'s convictions for first degree murder and conspiracy to commit first degree murder convictions. (Def. Exhibit A, at ¶ 1 and Exhibit B).

Pavlichko, Jr.'s history involves numerous encounters with the juvenile detention system. In 1999, he was adjudicated delinquent for multiple crimes including terroristic threats, disorderly conduct, harassment, retail theft, theft by unlawful taking and criminal mischief. (Def. Exhibit E, at 11-13). As a result of this background, he was first sentenced to Camp Adams for two months, after which he returned home. Id. at 14-15. Approximately a month and a half later, he violated his probation and Judge Mark Ciavarella of the Luzerne County Juvenile Court placed him at the Northwestern Boot Camp. Id. at 15-16. Following his three month placement at Northwestern, he was released to home, at which time he promptly violated his probation again. Id. at 17. He returned to Northwestern, in December of 2000, for a period of almost eight months. Id. at 19-20. Due to yet another violation,

2

Judge Ciavarella sent Pavlichko Jr. to defendant Glen Mills School. Upon discharge from Glen Mills, Pavlichko Jr. was sent to Luzerne County Juvenile Detention Center for approximately two weeks and then to the Lackawanna County Juvenile Detention Center for three weeks. (Def. Exh. E, at 125-126). Thereafter, on July 10, 2002, he was placed in Vision Quest Boot Camp for a period of three months. Id. at 18-19, 126-127. After his return home, he worked at Kentucky Fried Chicken for two days and violated his curfew again. Id. at 133-134. He appeared before Judge Ciavarella, who returned him to Northwestern Intensive Treatment Unit from December 10, 2002 to July 2003. Id. at 137-138.

The events which constitute the subject of this lawsuit occurred during Pavlichko Jr.'s stay at Glen Mills School. Glen Mills is a private facility and a residential school primarily for court-referred juvenile delinquent men. (Def. Exhibit C, at 49). After adjudicating a young man delinquent and consulting with a probation officer and a Glen Mills admissions representative, a judge decides whether he should come to the Glen Mills schools. (Def. Exhibit C, at 45). If such placement occurs, the school receives approximately $107 tuition per day from the responsible state agency. Id. at 46. Glen Mills uses some of that funding, plus proceeds from its golf course, to pay college tuition for successful graduates of the school. Id. at 47. Although Cosimo D. Ferrainola is the Glen Mills Executive Director and has been for

over twenty-eight years, he has limited his day-to-day activity there due to a stroke suffered in October of 2000. (Def. Exhibit C, at 34-35).

Glen Mills School does not have any fences, lockups or security force. Id. at 49. When a student comes into the school, he is assigned a cottage. Id. at 62. Each cottage has a staff with several counselors/teachers. One of the cottage staff is the student's direct counselor. Id.

The school has defined policies with respect to mail and visitation. Students are provided with writing materials and free postage. (Def. Exh. D, at 45). While students may receive and send mail, the practice of collecting letters and delivering arriving mail varies from unit to unit. Id. Outgoing mail may not be opened or read by staff, unless a court order so authorizes. Id. Likewise, incoming mail from federal, state or county officials, or from a student's attorney shall not be opened or read by staff persons. Id. Incoming mail from others shall also not be opened or read by staff unless there is a reasonable suspicion that contraband, or other information or material that may jeopardize the student's health, safety or well-being. Id. With regards to visitation, parents/guardians and grandparents may visit the school Monday to Friday, from 9:00 a.m. to 4:30 p.m. Visitors must schedule their visit through the Group Living Office. Id. at 46.

Students have access to public phones in the Student

4

Union building for use with collect and calling cards. They are available 37 hours per week during the normal hours of operation of the Student Union. Id. at 25. In addition, students may be eligible for home passes upon completing the required time period as stipulated to him by his jurisdiction. Id. at 46. Their issuance is discretionary and is based upon various factors including student behavior. Id.

In order to encourage pro-social behavior, encourage responsibility and facilitate personal growth, Glen Mills School has set up the Battling Bulls Club. Id. at 23. To become a member, a student must demonstrate positive behavior. Id. Members can then participate in on and off campus social activities, provide peer mentoring, earn campus jobs and act as part of the student government. Id.

To address a student's behavioral problems, Glen Mills School has set up a Staff Behavioral Management Program. This Program describes the various techniques to be used for a student's negative behavior, as follows:

**De-escalation Technique #1.  Friendly Non-Verbal.**

The Friendly Non-Verbal is first in the order of Behavioral Intervention. When a staff member observes a student who is involved with a problem they will give this student a helpful non-verbal gesture. These gestures are made with the eyes, hands, head or other body parts. These gestures are used to change the behavior of this student at the immediate time of the problem. Non-verbals given with empathy are given to effect change. If after a helpful non-verbal is given the student does not change their behavior a non-verbal

5

given with concern is the next technique utilized.

**De-escalation Technique #2.   Concern Non-Verbal**

After the student has not responded to the helpful non-verbals the next form of Behavioral Intervention is a concerned non-verbal.  This can be done by staff through stern and forceful facial gestures, hand gestures or other non-verbal gestures.  These non-verbals are used in order to change behavior or actions of a student at a particular time.  If a student does not respond to this level of intervention, a helpful verbal technique will be used next.

**De-escalation Technique #3.   The Helpful Verbal**

When a student is unable to read the concerned non-verbal, the next level would be the helpful verbal.  At this time, staff would verbally communicate, in a cordial manner their concern with the student involved in the incident.

**De-escalation Technique #4.   Concern Verbal**

After a student who has been given a helpful verbal concerning his negative actions and disregards this, the next step of intervention would be a concern verbal.  The concern verbal given by staff would inform the student in question that his actions are fact becoming a major concern to that staff member.  Intervening staff would accomplish this by using different voice levels, facial expressions, and non-physical actions.

**De-escalation Technique #5.   Staff Support**

Support is requested when the student ignores the concern verbal.  This is used to alert the student that his actions have reached a high level of concern.  This is done by enlisting staff support.  Staff support is given through both non-verbal and verbal communications such as different voice levels and facial expressions.  In addition, supporting staff also observe to ensure that all staff act professionally and prepare the physical environment to ensure safety in the event that the student becomes a threat to injure himself or others.

**Manual Assist**

In the event that the first five de-escalation techniques fail in motivating the student to change their behavior from negative to positive, a manual assist may be used. The sole purpose of the manual assist is to provide the student with a final attempt to gain self-control. The manual assist shall be conducted by staff placing their hands on the student's arm or shoulder area only and shall not exceed one minute. The purpose for this is to communicate to the student that their behavior is becoming a major concern to staff. The student's response will determine if the intervention will be de-escalated or if a restrictive procedure is necessary. If at any time during the manual assist the student becomes out of control and a threat to injure himself and/or others, a restrictive procedure will be utilized.

**Physical Restraint - Staff Only**

If all De-escalation Techniques have failed and the student becomes a threat to himself and/or others, it is the responsibility of those involved to hold the young man until he appears to settle down. The staff's primary objective is to hold that young man and keep him safe and under control. The restraining staff will use the least amount of physical restraint as possible until the student is no longer out of control or a threat to himself or others. At this time, staff will take the opportunity to talk to the student and use the incident to help the student mature and grow.

Id. at 41-43.

The school has also set up a "Student Grievance Process" under which a student may lodge a grievance "without fear of retaliation." Id. at 37. Under this process, a student has several options. First, he may discuss the grievance with a peer, with a Guided Group Interaction group, during a cottage Townhouse meeting, or during a Battling Bulls Club meeting. Id. at 37. Alternatively, the student can speak with his individual cottage

counselor within five days of the alleged violation. Id. If the counselor cannot resolve the concern, the student can speak with the Senior Counselor who will record the grievance on a "Grievance Tracking Form." Id. If it can be resolved within five days, the student will sign the form and the resolution will be recorded. Id. A student may continue working up the chain of command to the Cottage Team Leader, Group Living Director, then the Managing Director, the Executive Director and finally the student's Probation Officer or Worker. Id. at 37-38.

Plaintiff, Pavlichko Jr., was committed to Glen Mills on September 25, 2001, by order of Judge Ciavarella. (Def. Exh. E, at 21). Originally, he was assigned to live in Taylor Hall on the third floor. (Def. Exh. E, at 25, 28). The night before the incident in question, Pavlichko Jr. had changed rooms and moved in with his roommate Brandon. Id. at 28.

Prior to April of 2002, Pavlichko Jr. had not had any mentionable incidents at Glen Mills. On April 11, 2002, Pavlichko Jr. indicated that he began to listen to Brandon's walkman at approximately 11:30 p.m. and continued to do so after 12:00 a.m., which was bed time and lights out. Id. at 29-30. Another student, by the name of Joe Franz, who was that evening's student supervisor, witnessed Pavlichko Jr. breaking school rules and out of his bed. Id. at 31; Def. Exh. F, at 23. After Pavlichko Jr. saw Franz leave to tell staff of the infraction, he ran down the

hall, gave the walkman to another student and then ran back to his room and got in bed. Id. at 34-35. Thereafter, T.J. Green, one of the counselors on duty, went up to Pavlichko Jr.'s room with his supervisor Ed Norman and p.m. line staff counselor Todd Donahue. (Def. Exh. F, at 21-22). The staff entered the room, turned on the light and asked what Pavlichko Jr. and Brandon were doing. (Def. Exh. E, at 36, Exh. F at 24).

According to Pavlichko Jr.'s version of the events, Green began yelling and cursing at he and Brandon regarding the walkman. (Def. Exh. E, at 37). No one else said anything while Green was yelling. (Def. Exh. E, at 41-42). After Pavlichko Jr. stood silent, Green grabbed him by the shirt, took him with both hands and slammed him against the wall. Id. at 42. Green continued to yell and curse at him while holding him against the wall. Id. at 48. Approximately five minutes later, Green let go of Pavlichko Jr. and walked away. Id. at 48-49. Pavlichko Jr. denied saying anything to Green at that time. Id. As a result of this incident, he indicated that he had a small bump, about the size of a mosquito bite, on his head for about two weeks and some pain in his lower back. Id. at 58-59. He did not seek any medical attention or receive any treatment. Id. at 152. Following the incident, Pavlichko Jr. and Green never talked to each other again. Id. at 64.

Green's version of the incident, however, reflected a

somewhat more benign interaction. He explained that, upon hearing a report from Joe Franz, he entered Pavlichko Jr.'s room to confront him regarding his rules violation. While Ed Norman was talking to him, Pavlichko Jr. became very belligerent and began cursing. (Def. Exh. F, at 24). Thereafter, Green stated that he "intervened" and "manually assisted" by grabbing plaintiff by the elbows and saying that he needed to watch the way he was talking and to calm down. Id. at 24, 33. When Pavlichko Jr. stopped cursing, Green backed away. Id. The whole incident, according to Green, took place in a matter of seconds. Id. at 33.

Subsequent to this event, Pavlichko Jr. wrote to his father and informed him of what Green had supposedly done. (Def. Exh. E, at 96-97). Upon receipt of this information, Pavlichko Sr. sent a letter, dated April 16, 2002, to the Superintendent/Director of Glen Mills School, and copied his son, his son's attorney, Judge Ciavarella, the Pennsylvania state police and the Pennsylvania Department of Welfare. (Pl. Exh. E). In the letter, he objected to the alleged physical and verbal abuse of his son. Id. Moreover, he threatened to file civil litigation in federal court should the staff be unable to resolve this problem, and indicated his intent to file a formal complaint with the Pennsylvania State Police and the Pennsylvania Department of Welfare. Id. Finally, he stated that "should [Pavlichko Jr.] be denied home passes, telephone calls, visits or the like, including a favorable

recommendation for his June 2002 Review, it will be deemed an act of retaliation for him pursuing the enclosed civil complaint . . ." Id.[1]   Notably, Pavlichko Jr. never utilized the school's formal grievance process despite having a copy of the school handbook. (Def. Exh E, at 93-96; Def Exh. G).

Defendants allege, without referring to any specific evidence, that Pavlichko Sr. wrote to Glen Mills again on May 2, 2002 and May 3, 2002.  In the May 2nd letter, Pavlichko Sr. asserted that his son's legal mail was being seized and confiscated by Glen Mills staff.   Managing Director Garrison Ipcock discussed the complaints with Group Living Director Thomas Mann, who in turn met with Taylor Hall Team Leader Anthony Bacon.  They found no merit to Pavlichko's Sr.'s complaints.  In his May 3, 2002 letter, Pavlichko Sr. complained that his son's "Bull" status was removed after the Notice of Intent was filed and that his son's visitation was improperly supervised by staff on April 28, 2002. He further noted his concern that his son would not receive a favorable recommendation at his next review hearing before Judge Ciavarella.

On May 14, 2002, Pavlichko Jr. was transferred from Taylor Hall, where he had been since his arrival in September 2001, to Tyler Hall.  (Def. Exh. E, at 62).  Plaintiff believed that this

---

[1] The Department of Public Welfare did, in fact, conduct an investigation into the incident and found the allegation of abuse concerning Pavlichko Jr. to be unfounded.  Specifically, it noted that because he did not suffer severe pain and because his physical functioning was not temporarily or permanently impaired, he could not sustain an allegation of child abuse.  (Pl. Exh. J).

transfer occurred because his dad was "causing problems." Id. at
63-64.  Unit logs for Tyler Hall note that the transfer was due to
Pavlichko Jr.'s father "falsely accusing Tay[lor] staff of not
servicing him properly."  (Pl. Exh. H).  After the transfer,
Pavlichko Jr. further complained that James Welsh, the team leader
at Tyler Hall, took his mail and the paperwork he had received from
his father and refused to allow him access to them.  (Def. Exh. E,
at 89-90, 104).

On June 12, 2002, plaintiff received his Third
Comprehensive Report from Glen Mills School.  (Pl. Exh. F).  The
Report had six sections.  The first section, entitled "social",
noted that Pavlichko Jr.'s adjustment was "satisfactory," although
he had limited interaction with peers and some difficulties in
social situations.  Id.  He was showing proper respect for
counselors, but it was noted that his social status on campus was
low due to the lack of sincerity in his actions.  Id.  He learned
to use group counseling more effectively and had become a member of
the Battling Bulls Club, for which he was on inactive status due to
his need to re-establish a pattern of consistent, responsible and
positive behavior.  Id.  Further, the report remarked that although
the school had had frequent contact with his family, Pavlichko Jr.
had not had any home visits during the reporting period due to the
inconsistency of his behavior.  Id.

The report then went on to discuss academics, vocational

12

education, recreation and athletics.  It remarked that Pavlichko Jr. was in pre-G.E.D. classes, but his performance showed a need for improvement.  Further, he was receiving vocational instruction in automotive technology.  Id.  Under recreation, it was reported that Pavlichko Jr. displayed good sportsmanship in intramural activities, utilized the Student Union to socialize, made phone calls to family and friends, attended educational and sport award assemblies and sporting events and participated in unit activities including field trips.  Id.  Finally, under athletics, the report commented that Pavlichko Jr. did no varsity or junior varsity sports.  The report concluded by recommending that Pavlichko Jr. remain in placement at Glen Mills School.  Id.

Just prior to Pavlichko Jr.'s review placement hearing before Judge Ciavarella, Nelson Yanez, the admissions director at Glen Mills, received information concerning Pavlichko, Jr. from various Glen Mills staff.  Gregg Frazier told Yanez that Pavlichko Jr. had behavioral problems and held himself out as being above confrontation and above the rules.  (Pl. Exh. D at 43-44).  Specifically, Frazier remarked that Pavlichko Jr. bragged to his peers that he was "untouchable."  Id. at 45.  Ted Philben, plaintiff's counselor at Tyler Hall, stated that plaintiff was having behavior problems.  Id. at 48.  Other staff members also weighed in on plaintiff's performance.  Id. at 78-79.

Aside from the information from staff, Mr. Yanez reviewed

13

plaintiff's Third Comprehensive Report, which recommended his continued placement at Glen Mills. Id. at 63. Finally, he spoke with Sadie Cole, Pavlichko Jr's probation officer from Luzerne County, concerning his behavior at Glen Mills. Id. at 78. Despite the fact that Mr. Yanez testified that he had no idea which way the hearing would go, a unit log entry dated the day before his review hearing stated that "Pavlichko will be discharged tomorrow. (Pl. Exh. I).

Plaintiff's placement review hearing was held on June 17, 2002, before Judge Ciavarella in the Luzerne County Juvenile Court. During the hearing the following exchange occurred:

> THE COURT:       Jim, you're here today for your review
>                  hearing.  My understanding is that Glen
>                  Mills no longer wants you within their
>                  program.
>
> THE JUVENILE:    Yeah.
>
> THE COURT:       Do you know why?
>
> THE JUVENILE:    No.
>
> THE COURT:       Tell him why.
>
> MR. YANEZ:       He knows why, Your Honor.  He knows that
>                  he started buying into some of the
>                  behaviors and making comments such as
>                  alleging mistreatment to DPW that was
>                  investigated and unfounded.  Making
>                  comments like, "I'm untouchable" to his
>                  peers, which just tends to create a
>                  negative situation for –
>
> THE COURT:       Basically what you did, Jim, you created
>                  a situation that Glen Mills can't allow
>                  to exist.  They can't have you doing

things that you're doing; spreading your
poison and expecting the other kids to
perform like these two kids did.

I got to tell you something, Jim, I'm
going to take you out of Glen Mills.  I
don't want to, I really don't want to,
because I don't think it's good for the
program to allow kids to act the way you
acted and then get taken out of a program
that really was there to benefit you.

*  *  *

I get kids writing me letters thanking me
for sending them there.  I get letters
from kids begging me, don't let me come
home until I get my degree.  16 or 17
kids, I got one kid saying there's all
kinds of problems there.  Why do you
think that is?  I'll tell you why it is:

There's no problems.  You decide you want
to create a problem so you can get out
because you don't like the treatment, you
don't like the program, you don't like to
have to perform, that's why.

*  *  *

[Y]ou want me to believe there's a
problem because you say it.

THE JUVENILE:  No.

THE COURT:    There's no problem; is there?

THE JUVENILE:  No.

THE COURT:    The only problem there was you, right?

THE JUVENILE:  Yes.

(Pl Exh. G, at 2-4).  Thereafter, Pavlichko Jr. was discharged from

Glen Mills.  (Def. Exh. E, at 125-126).

Plaintiff commenced the current litigation in this Court

15

on June 6, 2002.  On July 9, 2002, the Honorable William H. Yohn appointed Pavlichko Sr. guardian ad litem for Pavlichko, Jr.  The latest Amended Complaint was filed on December 24, 2002, against Glen Mills School, Cosimo D. Ferrainola, Larry Laurence, Greg Frazier, Jim Welsh, Todd Donahue, T.J. Green and Nelson Yanez (collectively "defendants").  The Complaint alleges retaliation under 42 U.S.C. § 1983 against all defendants (Count I), conspiracy under 42 U.S.C. § 1983 against all defendants (Count II), Eighth Amendment violations under 42 U.S.C. § 1983 against defendant T.J. Green (Count III), assault against T.J. Green (Count IV), battery against T.J. Green (Count V), and "assault and battery - respondent superior" against Glen Mills School and Cosimo D. Ferrainola (Count VI).  (Def. Exh. A).  On August 25, 2003, defendants filed a Motion for Summary Judgment seeking dismissal of plaintiff's entire complaint under Federal Rule of Civil Procedure 56.  Having considered this Motion, together with the plaintiff's response, we now turn to a discussion of the issues before us.

II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED R. CIV. P. 56(c); see also Celotex Corp v.

<u>Catrett</u>, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 2552 (1986); <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 463-464 (3d Cir. 1989). A factual dispute is "material" only if it might affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). For there to be a "genuine" issue, a reasonable factfinder must be able to return a verdict (or render a decision) in favor of the non-moving party. <u>Id</u>. On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. <u>Boyle v. County of Allegheny, Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962); <u>Tigg Corp. v. Dow Corning Corp.</u>, 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party. <u>See</u> <u>Anderson</u>, 477 U.S. at 255.

Once the movant has carried its initial burden, Rule 56(e) shifts the burden to the nonmoving party as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule must set forth specific facts showing that there is a genuine

> issue for trial.   If the adverse party does not so
> respond, summary judgment, if appropriate, shall be
> entered against the adverse party.

FED. R. CIV. P. 56(e).  To raise a genuine issue of material fact,

however, "'the [summary judgment] opponent need not match, item for

item, each piece of evidence proffered by the movant,' but simply

must exceed the 'mere scintilla' standard."  <u>Petruzzi's ICA</u>

<u>Supermarkets, Inc. v. Darling-Delaware Co., Inc.</u>, 998 F.2d 1224,

1230 (3d Cir.), <u>cert. denied</u>, 510 U.S. 994, 114 S. Ct. 554 (1993)

(internal quotations omitted).   Rather, summary judgment may be

granted only if, after viewing all evidence in the light most

favorable to the non-movant, no jury could decide in that party's

favor.  <u>Tigg Corp.</u>, 822 F.2d at 361.

III. DISCUSSION

       Faced with numerous civil rights claims, as well state law

actions, defendants seek summary judgment on almost all counts of

the Complaint.  To assure both comprehensiveness and clarity in our

rulings, we address each of defendants' arguments individually.

   A.   <u>Section 1983 Claims</u>

       The primary thrust of plaintiff's complaint alleges

violations of his civil rights pursuant 42 U.S.C. § 1983.   A

plaintiff may bring a § 1983 action if he establishes that a person

acting under color of state law deprived him of rights, privileges,

or immunities secured by the Constitution or laws of the United

States.  42 U.S.C. § 1983 (1996).  To properly state a § 1983 cause

of action, a plaintiff must demonstrate that "(1) the defendants acted under color of [state] law; and (2) their actions deprived [the plaintiff] of rights secured by the Constitution or federal statutes." Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997). "Section 1983 'is not a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-394, 109 S. Ct. 1865, 1870 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S. Ct. 2689, 2694, n.3 (1979)).

Defendants now argue that neither of the two requisite components of a § 1983 claim have been met by plaintiff's allegations and the evidence he has adduced to support them. Specifically, they assert that Glen Mills is not a state actor for the purposes of section 1983. Second, they contend that plaintiff has failed to demonstrate a deprivation of a federally protected right.

1.    Whether Glen Mills is a State Actor

As noted above, a plaintiff in a section 1983 action bears the threshold burden of proving that "the alleged deprivation was committed by a person acting under color of state law." Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.), cert. denied, 516 U.S. 858, 116 S. Ct. 165 (1995) (quoting Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993)). Whether a person "acted under color of state law" for the purposes of § 1983 depends upon whether the

19

alleged deprivation of federal rights is "fairly attributable to the State." <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937, 102 S. Ct. 2744, 2753 (1982); <u>see also</u> <u>Krynicky v. University of Pittsburgh</u>, 742 F.2d 94, 97 (3d Cir. 1984), <u>cert. denied</u>, 47 U.S. 1015, 105 S. Ct. 2018 (1985).

"Although a private [party] may cause a deprivation of . . . a right, [it] may be subjected to liability under § 1983 only when [it] does so under color of law." <u>Flagg Bros., Inc. v. Brooks</u>, 436 U.S. 149, 156, 98 S. Ct. 1729, 1733 (1978). Indeed, there are, some circumstances in which "seemingly private behavior 'may fairly be treated as that of the State itself.'" <u>Brentwood Acad. v. Tennessee Secondary Sch.</u>, 531 U.S. 288, 295, 121 S. Ct. 924, 930 (2001) (quoting <u>Jackson v. Metropolitan Edison Co.</u>, 419 U.S. 345, 349, 95 S. Ct. 449 (1974)); <u>Robert S. v. Stetson School, Inc.</u>, 256 F.3d 159, 164 (3d Cir. 2001). Deciding whether a private entity has engaged in state action requires an inquiry into whether "there is a sufficiently close nexus between the State and the challenged action of [the private entity] so that the action of the latter may be fairly treated as that of the State itself." <u>Jackson</u>, 419 U.S. at 351; <u>see also</u> <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1004, 102 S. Ct. 2777, 2786 (1982). The Supreme Court, under differing circumstances, has formulated three separate tests to determine if a private entity can be considered a state actor for § 1983 purposes: (1) whether the private entity has exercised powers that

are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the State has so far insinuated itself into a position of interdependence with the acting party, that it must be recognized as a joint participant in the challenged activity. Mark v. Borough of Hatboro, 51 F.3d 1137, 1142-1143 (3d Cir.), cert. denied, 516 U.S. 858, 116 S. Ct. 165 (1995) (citing cases). In order to determine which test applies to a given set of facts, courts must carefully investigate the circumstances of each case. Brown v. Philip Morris, Inc., 250 F.3d 789, 801 (3d Cir. 2001).

Faced with the issue of whether a private school can be a public actor, the United States Supreme Court, in the case of Rendell-Baker v. Kohn, 457 U.S. 830, 102 S. Ct. 2764 (1982), relied upon the public function test. The defendant, a nonprofit corporation, operated a school on privately owned property. Rendell-Baker, 457 U.S. at 831-832. The school specialized in dealing with maladjusted students who encountered problems completing public high school. Most of the student body was referred to the school by the local school board or state agencies. Id. at 832. At one point, up to 99% of the schools operating budget came from public funds, which would be received as long as the state entered into contracts with public entities and complied with state regulations. Id. at 832-833. The plaintiff was a former employee

21

alleging retaliation under § 1983, when she was fired for supporting a student petition. Id. at 834. Holding that the school was not a state actor for purposes of § 1983, the court observed that the receipt of public funds by the school did not make the discharge of employees a state action. Id. at 840. Moreover, the court remarked that, even though the school was bound by state regulations, those regulations did not govern personnel decisions. Id. at 841. Finally, it found that the simple performance of a public function did not constitute state action where the function was not the "exclusive province of the state." Id. at 842. As such, the Court declined to allow a § 1983 action against the school.

The Third Circuit Court of Appeals reached the same conclusion under similar circumstances. In Robert S. v. Stetson School, Inc., 256 F.3d 159 (3d Cir. 2001), the plaintiff, a student, sued a private school, which specialized in the education of juvenile sex offenders, alleging physical and psychological damage arising out of "horseplay" by school staff. Id. at 163-164. Relying on § 1983, plaintiff argued that the school performed a function that has traditionally been the exclusive province of the state and, thus, was acting under color of state law. Id. at 165. Analogizing Rendell-Baker, however, the Third Circuit disagreed and held that "the mere fact that Stetson 'performs a function which serves the public does not make its acts state action.'" Id. at 166 (quoting Rendell-Baker, 457 U.S. at 842). The court went on to

emphasize that unlike a prisoner or person involuntarily civilly committed, whose custody constitutes state action, plaintiff's legal custodian had him placed at Stetson School. <u>Id</u>. 166-167. "Thus, his enrollment at Stetson was not 'involuntary' in the sense relevant here, i.e. he was not deprived of his liberty in contravention of his legal custodian's (or his mother's) wishes." <u>Id</u>. at 167. Indeed, the court repeatedly iterated that plaintiff was never adjudicated a "delinquent" and that the school actually declined to accept any students with criminal records. <u>Id</u>. at 162-163. Under these facts, the Stetson School did not act under color of state law. <u>Id</u>.

Both of these cases share one common critical thread -- they involved schools which were not serving students adjudicated delinquent. The instant matter, however, raises a new twist: plaintiff has been involuntarily placed at the defendant school upon an adjudication of delinquency by the state. In <u>Stetson</u>, The Third Circuit repeatedly made clear that because such disciplinary custody constitutes an exclusive public function, such a distinction could significantly alter the appropriate outcome of a § 1983 claim against a private school. <u>Id</u>. at 162-163.

In the recent case of <u>C.K. v. Northwestern Human Services</u>, 255 F. Supp.2d 447 (E.D. Pa. 2003), the Honorable Harvey Bartle III confronted this precise question of "whether a private facility for delinquent children and its employees are state actors under 42

23

U.S.C. § 1983." Id. at 448.  Plaintiff had been charged with a crime, adjudicated a juvenile delinquent by the Luzerne County Court of Common Pleas, and placed at Northwestern Academy.  Id.  After being sexually assaulted by one of the counselors, she brought an action against the school under § 1983.  Id.  Distinguishing Rendell-Baker and Stetson, wherein the defendants were serving dependent children as opposed to delinquent children,[2] the court noted that Northwestern Academy and its employees had custody of plaintiff, a child adjudicated delinquent under 42 Pa.C.S.A. § 6302, pursuant to a court order.  Id. at 451.  Judge Bartle found that, although Northwestern Academy was technically a private institution, it was clearly exercising power that is "traditionally exclusively reserved to the State" and performing a function that is "quintessentially governmental."  Id.  Indeed, he likened the situation to those in West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250 (1988), and McCullum v. City of Philadelphia, Civ. A. No. 98-5858, 1999 WL 493696 (E.D. Pa. July 13, 1999), wherein the private-entity defendants' contractual provision of medical services and food services to state prisoners was found to constitute a traditionally public function.  Id. at 449-450.  Reasoning that Northwestern Academy was similarly performing contract services in a prison

---

[2] Under 42 Pa.C.S.A. § 6302, a "delinquent child" is "[a] child ten years of age or older whom the court has found to have committed a delinquent act and is in need of treatment, supervision or rehabilitation."  A "delinquent act," with exceptions, "means an act designated a crime under the law of this Commonwealth . . ." Id.  A "dependent child," on the other hand, encompasses a much broader array of situations.

setting, he held that the school and its employees were acting under color of state law.  Id. at 451.

The salient facts in the case before us are virtually indistinguishable from those in Northwestern, thereby making its logic quite persuasive.  Pavlichko Jr., like plaintiff in Northwestern, was adjudicated delinquent and placed, at the behest of the state, in the Glen Mills School.  His placement was pursuant to a court order and, in no sense voluntary, either for him or for his legal guardians.  Under these circumstances, his status at Glen Mills School was effectively equivalent to that of an inmate at a state correctional institution and, thus, a power traditionally exclusively reserved for the state.  As the conduct at issue occurred during such custody, Glen Mills clearly acted under color of state law.

2.    Whether Plaintiff was Deprived of a Federally-
      Protected Right

As noted above, a viable section 1983 claim requires not merely a showing of state action, but also a demonstration that the state action deprived the plaintiff of rights secured by the Constitution or federal statutes.  Defendants again assert that plaintiff has neglected to make this showing.  Plaintiff, on the other hand, responds by citing to three different constitutional violations:  (1) defendants retaliated against him for the exercise of his First Amendment rights; (2) defendants engaged in a conspiracy to retaliate against him for the exercise of his First

Amendment rights; and (3) defendant T.J. Green violated the Eighth Amendment prohibition against cruel and unusual punishment.  We address each individually.

a.    Retaliation Under the First Amendment

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests - especially, his interest in freedom of speech." Perry v. Sindermann, 408 U.S. 593, 597, 92 S. Ct. 2694 (1972).

The First Amendment prohibition on abridging freedom of speech applies to the states through the Due Process Clause of the Fourteenth Amendment. See Duncan v. Louisiana, 391 U.S. 145, 148, 88 S. Ct. 1444, 1446-1447 (1968), reh'g denied, 392 U.S. 947, 88 S. Ct. 2270 (1968).  To assess retaliation claims made pursuant to the First Amendment, a three-step, burden-shifting analysis applies. Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995). First, the plaintiff must establish that he engaged in conduct or speech that is protected by the First Amendment. Id.  Second, he or she must show that the defendant responded with retaliation, and that the protected activity was a substantial or motivating factor in the alleged retaliatory action. Id.  Third, if the plaintiff

26

satisfies his burden under steps one and two, the defendant has the opportunity to defeat the plaintiff's claim by demonstrating, by a preponderance of the evidence, that the same action would have been taken even in the absence of the protected conduct. Id. Defendants contend that, under both steps one and two, plaintiff's claim must fail.

i.    Protected Conduct or Speech

The threshold issue in a First Amendment retaliation claim focuses on whether the speech identified by plaintiff bears the protection of the First Amendment. Watters, 55 F.3d at 892. To be protected under the First Amendment, a plaintiff's speech or conduct must satisfy two conditions: (1) it must address a matter of public concern and (2) the value of the plaintiff's expression must outweigh "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997). (quoting Connick v. Myers, 461 U.S. 138, 150, 103 S. Ct. 1684 (1983). Speech addresses a matter of public concern when it can fairly be considered to relate "to any matter of political, social, or other concern to the community." Watters, 55 F.3d at 892 (quoting Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993)). Whether speech touches on a matter of public concern is a legal question to be determined by the court, not the finder of fact. See Connick, 461 U.S. at 148 n. 7.

27

In the case at bar, the alleged protected activity at issue concerns correspondence written by Pavlichko Sr. on behalf of his son. Pavlichko Jr. contends that due to his communication with his father regarding the school's mistreatment of him and his father's subsequent complaints to the school, he was retaliated against in contravention of his First Amendment rights. While defendant does not contest that such speech by Pavlichko Sr. was of public concern and, thus, protected activity, it asserts that Pavlichko Jr. has no standing since the speech at issue was that of his father.

In an attempt to dismantle defendants' arguments, plaintiff cites to an analogous case from the District of Oregon. In <u>Cain v. Tigard-Tualatin School District 23J</u>, 262 F. Supp.2d 1120 (D. Or. 2003), a high school student and his parents brought suit under § 1983 against the student's school district and football coach. <u>Id</u>. at 1123. After the coach engaged in verbal tirades against the students, plaintiffs complained and, as a result, the student allegedly suffered retaliation at the hands of the coach. <u>Id</u>. at 1124. When the student raised a First Amendment retaliation claim, the defendants argued that they could not have violated the student's constitutional rights by retaliating against him for speech made by third parties, *i.e.* his parents. <u>Id</u>. at 1127.

Rejecting this argument, the court remarked that "[t]he First Amendment protects not only a citizen's right to speak freely

but also his or her right to associate freely with other speakers
of similar opinions" and that, "[t]here are few associational rights
more intimate and fundamental than the right of a minor child to
associate with his parents who are engaged in protective speech made
on the child's behalf." Id.  Because of the position of authority
held by the defendants over the student, the student authorized his
parents to attempt to protect him from the abusive conduct and
adopted their complaints. Id.  Moreover, the court found that the
coach's conduct "was motivated by [the student's] association with
his parents' speech . . . such that he intended to stifle the speech
by intimidating and harassing [the student]." Id.  Finally, the
mere fact that the student could speak did not meant that he was not
engaged in constitutionally protected activity.   "The First
Amendment protects not only [the student's] right to associate with
his parents who are speaking on his behalf, but also [the student's]
right to speak freely, even if [the coach's] intimidating conduct
successfully inhibited that speech." Id.  Based on the intolerant
climate, the court determined that the student was forced to protest
the coach's conduct through his parents.  Id.

        Although the ruling in Cain does not, in any way, bind
this Court, we find its logic to be both convincing and germane to
the case before us.  Like the plaintiff in Cain, Pavlichko Jr. was
a minor student under the authority of defendants.  While he had a
grievance process available to him through the school, he testified

29

that he understood it to be used only for complaints against other
students, as opposed to when the school was the actual culprit in
the alleged wrongdoing.  (Pl. Exh. A, at 93-94).  Purportedly
lacking any other remedy, Pavlichko Jr., using his protected right
of association, complained to his father, who, in turn, exercised
First Amendment free speech rights on behalf of his son.  See
Agresta v. Sambor, 687 F. Supp. 162, 164 (E.D. Pa. 1988)
(recognizing right of association between parent and child).  These
complaints were authorized and adopted by Pavlichko Jr. and directly
concerned the matters about which he spoke to his father.  The
alleged retaliation was, according to plaintiff's complaint,
motivated specifically by his association with his father's speech
and was designed to quell any such further association.  Finally,
the mere fact that plaintiff did not use the grievance process may
reflect only that the school's conduct successfully inhibited his
speech.  Consequently, we find that plaintiff's claim is, in fact,
based on his own protected conduct rather than that of his father.

       In any event, even if we were to deem the only protected
activity to be that of Pavlichko Sr., the doctrine of third-party
standing allows plaintiff to assert a claim for the injuries
suffered as a result of any alleged retaliation.  The longstanding
basic rule of third party standing states that "[i]n the ordinary
course, a litigant must assert his or her own legal rights and
interests, and cannot rest a claim to relief on the legal rights or

interests of third parties." <u>Powers v. Ohio</u>, 499 U.S. 400, 410, 111 S. Ct. 1364, 1370 (1991). The rule serves at least two judicial purposes. First, "[i]t fosters judicial restraint: courts faced with unsettled questions avoid pronouncements that are perhaps unnecessary and undesirable because the rightholders do not wish to assert their rights." <u>Amato v. Wilentz</u>, 952 F.2d 742, 748 (3d Cir. 1991). "Second, the rule assures concrete, sharp presentation of the issues and enables courts to avoid ruling on abstract grievances." <u>Id</u>.

This rule, however, is not inflexible and, in certain defined circumstances, when the policies supporting the general rule are not served, third-party standing exists. <u>Id</u>. (citing <u>Singleton v. Wulff</u>, 428 U.S. 106, 114-115, 96 S. Ct. 2868, 2874 (1976). "Where rightholders are unable to raise their own rights and their relationship with the plaintiff suggests an identity of interests, courts can be more certain that the litigation is necessary and that the issues will be framed clearly and effectively." <u>Id</u>. The United States Supreme Court has enumerated three factors which a court must consider prior to allowing third-party standing: (1) the relationship between the plaintiff and the third-party whose rights are being asserted; (2) the ability of third party to advance his own rights - whether some obstacle impedes the rightholders own suit; and (3) the impact on the third party's interests, <u>i.e.</u> whether the plaintiff and the third party have consistent interests.

Caplin & Drysdale, 491 U.S. 617, 623 n. 3, 109 S. Ct. 2646, 2651 n.
3 (1989).

All three factors advocate in favor of allowing Pavlichko
Jr. to proceed under third-party standing.  First, while Pavlichko
Sr. did not have legal guardianship of his son, he was nonetheless
his natural father.  Such a paternal relationship, notwithstanding
the legalities of guardianship, implicates a recognized
constitutional relationship.[3]  See Ceiba, Inc. v. Ford Motor Credit
Co., Civ. A. No. 03-1402, 2003 WL 22204560, *6 (E.D. Pa. Sept. 22,
2003) (recognizing that parent-child relationship satisfies the
relationship portion of the third party standing test); see also
Lewis v. Thompson, 252 F.3d 567 (2nd Cir. 2001) (same).  Second,
although the school did maintain an established grievance process,
it is certainly reasonable that plaintiff would have chosen not to
utilize it, being that he would have had to go to the very same
school employees about which he was complaining.  Accordingly, an
obstacle impeded his exercise of rights.[4]  Finally, the claimed
retaliation, if true, directly affected plaintiff's interests since,

---

[3] Defendants contend that plaintiff's guardians, his natural
grandparents, could have and should have asserted plaintiff's rights on his
behalf, but chose not to because they supported Glen Mills's treatment of him.
In making this allegation, however, defendants cite to absolutely no evidence.
To the contrary, plaintiff points to Pavlichko Sr.'s deposition wherein he
indicates that his parents, plaintiff's guardians, instructed him to get more
information from his son about the incident.  (Pl. Exh. B, at 21).

[4] Plaintiff also asserts that Pavlichko Jr. could not have used the
student grievance process since he did not receive a copy of the student
handbook which defines the grievance policy.  A receipt dated September 25,
2001 and signed by plaintiff, however, belies that allegation.  (Def. Exh. G).

as a result of his father's speech, he alone allegedly suffered adverse consequences at the behest of the school. Consequently, we find that plaintiff could, if necessary, assert third-party standing for this claim.

## ii. <u>Adverse Action</u>

The second aspect of a § 1983 retaliation claim requires proof that the defendant responded with retaliation or adverse action against plaintiff. Defendants contend that this aspect of plaintiff's claim fails in two respects. First, they assert that plaintiff's allegations regarding the actions of the school do not demonstrate that plaintiff lost any legal claim or suffered the kind of injury to prevail in a § 1983 claim. Second, they maintain that, assuming plaintiff's allegations are sufficient, there is no evidence that the alleged retaliatory acts were committed.

Defendants' first assertion is completely misplaced. "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." <u>White v. Napoleon</u>, 897 F.2d 103, 111-112 (3d Cir. 1990). The alleged retaliatory action itself does not have to infringe on a federally protected right independent of the First Amendment. In <u>Perry v. Sindermann</u>, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697 (1972), the United States Supreme Court explained that:

> [E]ven though a person has no "right" to a valuable governmental benefit and even though the government may

> deny him the benefit for any number of reasons, ... [the
> government] may not deny a benefit to a person on a basis
> that infringes his constitutionally protected interests
> ... his interest in freedom of speech. For if the
> government could deny a benefit to a person because of
> his constitutionally protected speech or associations,
> his exercise of those freedoms would in effect be
> penalized and inhibited.

Id. at 597.  The First Amendment is thus offended not only when a

speaker is denied some kind of entitlement, but also when a lesser

interest is affected in such a way that an actor's right to free

speech is impaired.  The infringement "need not be particularly

great in order to find that rights have been violated." Elrod v.

Burns, 427 U.S. 347, 359 n. 13, 96 S. Ct. 2673, 2683 n. 13 (1976)

(noting that the First Amendment is violated "both where the

government fines a person a penny for being a Republican and where

it withholds the grant of a penny for the same reason.").  Indeed,

the Supreme Court has recognized that the First Amendment protects

against "even an act of retaliation as trivial as failing to hold

a birthday party for a public employee ... when intended to punish

her for exercising her free speech rights." Rutan v. Republican

Party of Illinois, 497 U.S. 62, 76 n. 8, 110 S. Ct. 2729, 2738 n.

8, reh'g denied, 49 U.S. 1050, 111 S. Ct. 13 (1990) (quotations

omitted).

In the matter before us, plaintiff contends that, as a

result of his father's complaints to Glen Mills School, he suffered

numerous adverse consequences, including the reading of his mail by

Glen Mills staff, loss of Bull status, transfer from Taylor Hall to

Tyler Hall, supervision of his visitation with his grandmother and improper discharge from the school after his placement review hearing. Such allegations, if believed by a jury, unequivocally support a § 1983 retaliation claim. The fact that an individual has no constitutional right to unsupervised visits by family members or to remain in a particular institution does not affect the validity of plaintiff's claim. Rather, the mere suffering of adverse consequences allegedly due to the exercise of the First Amendment sufficiently infringes on plaintiff's constitutional rights.

Pursuant to their second argument, defendants assert that the record remains devoid of evidence that each individually named defendant retaliated against plaintiff. Upon reviewing the evidence, we agree in part, as follows:

**T.J. Green:** Plaintiff concedes that, after the alleged assault, Green had no further substantive contact with him. As plaintiff agrees to dismiss the retaliation claims against Green, we grant summary judgment on this count.

**James Welsh:** With regards to James Welsh, Pavlichko Jr. testified that, after he was transferred from Taylor Hall to Taylor Hall, Welsh "took all [his] dad's letters and the documents that [his] dad sent to [him] and put them in an envelope and told [him] that [he] had to send them home and that [he] could no longer receive them. And if [he] got them, [Welsh] was going to return to sender and send them back to [his] father." (Pl. Exh. A, at 89-90).

Although defendants deny that this happened, they cite to no evidence to contradict this testimony. In any event, the prevailing jurisprudence mandates that we view the evidence in the light most favorable to plaintiff. Doing so, we find that a genuine issue of material fact remains as to whether Welsh took adverse action against plaintiff.

**Nelson Yanez:** Plaintiff alleges that, in retaliation for his requesting an investigation from various state officials, defendant Yanez contacted the Probation Department of the Juvenile Court of Luzerne County and requested that he be removed from Glen Mills. Defendants now argue that there is no evidence that Mr. Yanez, or anyone else from Glen Mills, requested that Pavlichko Jr. be removed from Glen Mills. Plaintiff, on the other hand, responds that Mr. Yanez was directly responsible for his removal from the school.

We find no support in the record for plaintiff's position. Mr. Yanez testified that, after reviewing plaintiff's third comprehensive report from Glen Mills, he believed that Pavlichko, Jr. should stay at the school. (Def. Exh. D, at 76-77). Further, Mr. Yanez explained that he spoke with Sadie Cole, Pavlichko, Jr.'s probation officer, and likewise recommended plaintiff's continued placement at Glen Mills. Id. at 82. Ultimately, though, Mr. Yanez knew the decision would be left up to the judge at the nine-month review hearing, and he testified that he did not know, at any point

prior to the hearing, that Pavlichko Jr. would be discharged.  Id.
at 77, 86-86.

Plaintiff contends, however, that the evidence raises the
inference that someone informed Judge Ciavarella, prior to the
hearing, of Glen Mills' desire to have Pavlichko Jr. discharged.
Specifically, he cites to a Glen Mills unit entry log, dated June
16, 2001 – the day before the review hearing – which states that
"Pavlichko [Jr.] will be discharged tomorrow."  (Pl. Exh. I).
Moreover, he notes that Judge Ciavarella commenced the review
proceedings by stating that, "[m]y understanding is that Glen Mills
no longer wants you in their program," indicating that someone had
communicated that sentiment to the judge.  (Pl. Exh. J).  After the
judge made this comment,  Mr. Yanez confirmed Glen Mill's position
and explained that Pavlichko Jr. "started buying into some of the
behaviors and making comments such as alleging mistreatment to DPW
that was investigated and unfounded.  Making comments, like 'I'm
untouchable' to his peers, which just tends to create a negative
situation for --" (Pl. Exh. J).

Contrary to plaintiff's argument, however, we find no
retaliatory behavior directly attributable to Mr. Yanez as an
individual.  No evidence exists that Mr. Yanez contacted the court
prior to the review hearing or made any recommendation that
plaintiff be discharged.  Indeed, as noted above, Mr. Yanez
testified that he believed plaintiff should remain at the school and

recommended such to plaintiff's probation officer. Moreover, Mr. Yanez had never seen the unit log entry indicating that plaintiff would be discharged. His acquiescence to Judge Ciavarella's comments at the hearing does not evidence his individual efforts to have plaintiff discharged due to his complaints. While defendant Glen Mills School might be held responsible for the alleged retaliatory discharge, we do not find any evidence that Mr. Yanez personally took any such action. Accordingly, we must dismiss the retaliation claim against him.

**Cosimo D. Ferrainola, Larry Laurence, Greg Frazier & Todd Donahue:** Plaintiff notes that discovery has not produced sufficient evidence to support any allegations against these three individual defendants and agrees to dismiss them from the lawsuit. Honoring that request, the Court grants summary judgment to Cosimo D. Ferrainola, Larry Laurence, Greg Frazier & Todd Donahue on all counts.

### iii. Substantial Motivating Factor

In a final effort to undermine plaintiff's section 1983 retaliation claim, defendants argue that any conduct related to the plaintiff was not substantially motivated by the plaintiff's exercise of his First Amendment rights. While we question the strength of plaintiff's argument on this portion of his claim, we find that a genuine issue of material fact remains.

At this stage of the analysis, plaintiff bears the burden

of showing that the protected activity was a substantial or motivating factor in the retaliation. <u>Johnson v. Lincoln Univ. of Com. System of Higher Educ.</u>, 776 F.2d 443, 454 (3d Cir. 1985). Should plaintiff make such a showing, the burden shifts to defendants to prove, by a preponderance of the evidence, that they would have taken the same action, even in the absence of the protected conduct. <u>Id</u>. at 454-455 (citations omitted).

Defendants assert that plaintiff's exercise of his First Amendment rights had no relation to the adverse disciplinary actions taken against him. Rather, they contend, without citing to deposition testimony or other evidence, that after Pavlichko Sr. complained to the various state agencies, Pavlichko Jr. began to tell other students that he was "untouchable." Staff began to feel that plaintiff was beyond confrontation. Moreover, defendants argue that plaintiff lost his bull status because he had difficulty with his peers and staff. Finally, they claim that he was transferred from Taylor Hall to Tyler Hall in order to have another chance to establish himself in the Glen Mills system.

While such explanations may ultimately prevail before a jury, this Court, on summary judgment, cannot disregard the contrary evidence submitted by plaintiff. In his deposition, Pavlichko Jr. denied that he called himself "untouchable," but noted that another student told the staff that he made such a remark. (Pl. Exh. A, at 117). Moreover, the unit log from Tyler Hall indicates that

plaintiff was transferred there due to "[f]ather falsely accusing Tay[lor] staff of not servicing him properly." (Pl. Exh. H). Finally, plaintiff testified that the only mail withheld from him was that pertaining to his father's follow-up on his complaints of abuse. (Pl. Exh. A, at 89-90). Rule 56 requires that, if conflict arises between the evidence presented by both sides, the Court must accept as true the allegations of the non-moving party. Faced with such a conflict, we are bound to allow this issue to reach a jury. Consequently, we deny summary judgment on the § 1983 retaliation claims as against Glen Mills and James Welsh.

b. Conspiracy Claims

Count II of plaintiff's complaint asserts that defendants participated in a conspiracy with Judge Ciavarella to retaliate against Pavlichko, Jr. Defendant seeks summary judgment on this count, citing to the dearth of supporting evidence. Absent any responsive argument by plaintiff, we dismiss this claim.

To state a section 1983 conspiracy claim, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. Marchese v. Umstead, 110 F. Supp.2d 361, 371 (E.D. Pa. 2000). A conspiracy constitutes "a combination of two or more persons to do a criminal act, or to do a lawful act by unlawful means or for an unlawful purpose." Panayotides v. Rabenold, 35 F. Supp.2d 411, 419 (E.D. Pa. 1999)

40

(citing <u>Hammond v. Creative Financial Planning</u>, 800 F. Supp. 1244, 1248 (E.D. Pa. 1992). To survive summary judgment, the plaintiff must make specific factual allegations of a combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right. <u>Fioriglino v. City of Atlantic City</u>, 996 F. Supp. 379, 385 (D.N.J. 1998), <u>aff'd</u>, 185 F.3d 861 (3d Cir. 1999), <u>cert. denied</u>, 528 U.S. 1075, 120 S. Ct. 789 (2000). In other words, plaintiff must demonstrate that there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objective. <u>Id</u>. at 386. Moreover, "[p]laintiff must prove with specificity the circumstances of the alleged conspiracy, such as those addressing the period of conspiracy, object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose." <u>Id</u>.

In his Complaint, plaintiff alleges that defendants Glen Mills School, Jim Welsh, T.J. Green and Nelson Yanez[5] conspired and agreed with Judge Mark Ciavarella to undertake adverse actions against him in retaliation for the exercise of his First Amendment

---

[5] Plaintiff's complaint also included Cosimo D. Ferrainola, Larry Laurence, Greg Frazier & Todd Donahue in this conspiracy. In his Memorandum of Law in Opposition to Summary Judgment, however, he concedes that there is insufficient evidence to support any allegation against them. As we have already dismissed them from the lawsuit, we do not consider them as part of the alleged conspiracy.

rights.  Defendants now correctly contends that plaintiff has failed to adduce any evidence sufficient to support such a claim.

As a primary matter, under the intracorporate conspiracy doctrine, although individual defendants can conspire together, a conspiracy cannot exist between officers or employees of a corporation and the corporation itself.  See Robison v. Canterbury Village, Inc., 848 F.2d 424, 431 (3d Cir. 1988) (citing cases); Dooley v. City of Philadelphia, 153 F. Supp.2d 628, 661 (E.D. Pa.), on reconsideration in part, 161 F. Supp.2d 592 (E.D. Pa. 2001). Accordingly, to the extent that plaintiff alleges that the individual defendant employees conspired with employer Glen Mills School to retaliate against plaintiff, this claim must be dismissed as to Glen Mills.

Moreover, nothing in the record before us evidences any "meeting of the minds" among any of the defendants or between the defendants and Judge Ciavarella, who is not even a defendant in this lawsuit.  Although evidence suggests that Judge Ciavarella was aware, prior to the placement hearing, that Glen Mills did not want plaintiff in the school any longer, there is no indication of any conspiracy between the judge and the defendants designed specifically to have plaintiff discharged from the school.  Nothing reflects that Judge Ciavarella's decision was motivated by anything other than the exercise of his reasonable discretion.  Indeed, in response to defendants' motion for summary judgment, plaintiff puts

forth no argument and cites no supporting evidence whatsoever, despite his obligation to do so under Fed. R. Civ. P. 56(e). In light of this implicit recognition that the conspiracy claim has no merit, we grant summary judgment on this ground.

                    c.    Eighth Amendment Claim

        In the third portion of his § 1983 action, plaintiff raises an Eighth Amendment claim against T.J. Green. Specifically, plaintiff alleges that defendant T.J. Green pushed him into a wall and held him there for five minutes while yelling at him. Our review reveals no legal or factual basis for this claim.

        The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment by state actors. U.S. Const., amend. VIII. The core issue presented by an Eighth Amendment claim alleging excessive force by a prison official is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995 (1992). Not all tortious conduct which occurs in prison constitutes "cruel and unusual punishment" in violation of the Eighth Amendment. See Howell v. Cataldi, 464 F.2d 272,277 (3rd Cir. 1972). It does not protect an inmate against de minimis use of force. Smith v. Mesinger, 293 F.3d 641, 648 (3d Cir. 2003). Consequently, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional

                                43

rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert denied, 414 U.S. 1033, 94 S. Ct. 462 (1973). Moreover, courts considering claims of excessive force have generally held that a single, isolated incident does not rise to the level of a constitutional violation. See, e.g., Ostranger v. Horn, 145 F. Supp.2d 614, 618 (M.D. Pa. 2001) (citing Norman v. Taylor, 25 F.3d 1259, 1262-64 (4th Cir.1994), cert denied, 513 U.S. 1114, 115 S. Ct. 909; White v. Holmes, 21 F.3d 277, 280-81 (8th Cir.1994), reh'g denied; Black Spotted Horse v. Else, 767 F.2d 516 (8th Cir.1985); Ricketts v. Derello, 574 F. Supp. 645 (E.D. Pa. 1983)).

In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of the forceful response. Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (citing Whitley v. Albers, 475 U.S. 312, 321, 106 S. Ct. 1078, 1085 (1986)).

The facts regarding the allegedly objectionable incident, in this case, remain somewhat in dispute. Plaintiff contends that defendant T.J. Green grabbed him by the shirt, took him with both

44

hands and slammed him against the wall.  The push lasted a few seconds and Green continued to hold plaintiff against the wall for five minutes while waiting for support staff.  As a result of this incident, plaintiff indicated that he had a small bump, about the size of a mosquito bite, on his head for about two weeks and some pain in his lower back.  Green, on the other hand, maintains that plaintiff became "very belligerent" and started cursing.  In his deposition, he indicated that, he "intervened" and "manually assisted" by taking plaintiff by the arms and stating that he needed to watch the way he was talking.  When plaintiff calmed down, Green explained that he let go and backed away.

Even when viewing the evidence in the light most favorable to plaintiff, we find no conduct that rises to the level of a deprivation of a constitutional right.  First, plaintiff concedes that he had no previous problems or incidents at Glenn Mills prior to the event at issue.  Nor did plaintiff have any contact with Green following these events, making this nothing more than a single, isolated incident.  Moreover, plaintiff admitted that he was violating the rules and that the brief incident occurred in an attempt by staff to rectify the situation and restore discipline.  Such facts do not permit any inference that Green intended to maliciously and sadistically apply force to cause harm.  Further, while plaintiff's threat to the safety of the staff and other residents remains arguable, the use of force was not excessive.

Green grabbed plaintiff and pushed him against a wall, held him
there and yelled in his face – conduct which does not rise to cruel
and unusual punishment.  Finally, plaintiff suffered nothing more
than <u>de</u> <u>minimis</u> injuries, consisting of a bump the "size of a
mosquito bite" on the back of his head and low back pain.  He never
sought even minimal medical attention.  Considering these factors
in combination, we are compelled to grant defendants' motion for
summary judgment on this claim.

    B.   <u>State Law Assault and Battery Claims</u>

          In addition to his federal claims, plaintiff sets forth
causes of action under Pennsylvania state law for assault and
battery.  As the standard for such a cause of action is relatively
low, we find that plaintiff has raised the modicum of evidence
necessary to preclude summary judgment.

        "To prove [a] claim of assault, under Pennsylvania law,
[p]laintiff must show that a particular [d]efendant intentionally
caused an imminent apprehension of a harmful or offensive bodily
contact in [p]laintiff."  <u>Lakits v. York</u>, 258 F. Supp.2d 401, 407
(E.D. Pa. 2003) (citations omitted).  In other words, "[a]n assault
is an intentional attempt by force to do an injury to the person of
another."  <u>Renk v. City of Pittsburgh</u>, 641 A.2d 289, 293 (Pa. 1994)
(quoting <u>Cohen v. Lit Bros.</u>, 70 A.2d 419, 421 (Pa. Super. 1950)).
"To prove [a] claim of battery, [a] [p]laintiff must establish that
a particular [d]efendant intended to cause a harmful or offensive

contact to [p]laintiff, or an imminent apprehension of such contact in [p]laintiff, and that such contact with [p]laintiff resulted." Lakits, 258 F. Supp.2d at 407. "[A] battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." Renk, 641 A.2d at 293 (Pa. 1994) (quoting Cohen, 70 A.2d at 421).

Plaintiff has produced record evidence that creates issues as to his "imminent apprehension" of offensive contact, the extent of the verbal and physical contact and Mr. Green's motive or intent in making the contact. In his deposition he states that "he...took me with both hands and slammed me against the wall." (Def. Exh. E, at 42). He further asserts that Mr. Green was "yelling at me, yelling and cursing at me." (Def. Exh. E, at 47). Finally, plaintiff has stated for the record that "when [Green] was yelling at me he was coming real close to my face...spit was coming out of his mouth onto my face when he was yelling at me." (Def. Exh. E at 48-49). Such testimony satisfies plaintiff's burden on summary judgment.

Defendants' contrary account of the events does not suffice to eliminate these genuine issue of material fact. Nor do the facts that plaintiff did not sustain any injury and that the Pennsylvania Department of Public Welfare found no merit to the plaintiff's claims of abuse lead us to grant summary judgment. As noted above, under Fed. R. Civ. P. 56, the Court is required to view

47

the evidence in the light most favorable to plaintiff.  Doing so mandates that we deny defendants motion on this ground.

C.    Punitive Damages

Finally, defendants challenge plaintiff's request for punitive damages against the individual defendants.  As plaintiff seeks such damages resulting from defendants' alleged § 1983 violation and defendants' alleged state law violations, and because the standards for punitive damages vary under federal and state law, we address them separately.

1.    Punitive Damages for § 1983 Violation

Punitive damages in § 1983 cases are available against individual state actors where the defendants have acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." Bennis v. Gable, 823 F.2d 723, 734 (3d Cir.1987) (quoting Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640 (1983)).  Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard.  Savarese v. Agriss, 883 F.2d 1194, 1204 (3d Cir. 1989).   Punitive damages, however, generally "represent a limited remedy, to be reserved for special circumstances." Savarese v. Agriss, 883 F.2d 1194, 1205 (3d Cir. 1989) (citing Cochetti v. Desmond, 572 F.2d 102, 105-06 (3d Cir. 1978)).  "[D]espite its utility as a deterrent, the punitive damage remedy must be reserved . . . for cases in which the

defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief." <u>Cochetti</u>, 572 F.2d at 106.

In the matter before us, the only remaining individual defendant in plaintiff's retaliation claim is James Welsh.[6] While this Court's review of the evidence advocates against an award of punitive damages, we are unable to dismiss this claim on summary judgment. Taking the facts in the light most favorable to plaintiff, it is indeed conceivable, albeit unlikely, that a jury could deem his actions of withholding plaintiff's mail to be motivated by a reckless or callous disregard for plaintiff's First Amendment rights. The validity of this claim depends almost entirely on the jury's findings regarding defendant Welsh's state of mind and the circumstances surrounding his actions. Accordingly, we are unable, on summary judgment, to make such a determination.

2.   <u>Punitive Damages for State Law Violation</u>

The legal standard for punitive damages for state law claims is a matter of state law. <u>See</u> <u>Griffiths v. CIGNA Corp.</u>, 857 F. Supp. 399, 409-410 (E.D. Pa. 1994), <u>aff'd</u>, 60 F.3d 814 (3rd Cir.

---

[6] Plaintiff apparently does not seek punitive damages from defendant Glen Mills School. In any event, governmental entities are immune from punitive damages under § 1983. <u>Grimm v. Borough of Norristown</u>, 226 F. Supp.2d 606, 657 (E.D. Pa.), <u>amended</u> Civ. A. No. 01-431, 2002 WL 737497 (E.D. Pa. Mar. 11, 2002) (citing <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 101 S. Ct. 2748 (1981). The rationale underlying this rule is that in general, "such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised." <u>Newport</u>, 453 U.S. at 263. In light of the fact that Glen Mills School is a state actor for purposes of section 1983 and receives the bulk of its funding from the state, we would be loath to allow a punitive damages claim to proceed against it.

1995). Pennsylvania state courts have embraced Section 908(2) of the Restatement (Second) of Torts, which states that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference[7] to the rights of others." RESTATEMENT (SECOND) OF TORTS, §908(2) (1979); see Feld v. Merriam, 485 A.2d 742, 748 (Pa. 1984); see also Kirkbride v. Libson Contractors, 555 A.2d 800, 803 (Pa. 1989). The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious. Feld v. Merriam, supra, 485 A.2d at 747-748.

As noted above, plaintiff retains a state law claim for assault and battery against defendant T.J. Green. On this charge the Court finds absolutely no legitimacy to a punitive damages claim. As repeatedly emphasized above, Green's actions were in response to his violation of school rules, consisted of nothing more than a push against the wall, caused no injuries and lasted no more than five minutes. Moreover, Green had absolutely no contact with plaintiff following the incident. No facts of record suggest that Green displayed a reckless disregard for plaintiff's well-being.

---

[7] Section 500 of the Restatement (Second) of Torts defines "reckless disregard" as follows:
> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts §500.

Consequently, we grant summary judgment.

IV.   CONCLUSION

While the record before the Court dictates that some of plaintiff's claims be dismissed, we recognize the existence of multiple issues of material fact requiring adjudication by a jury. Accordingly, we grant defendants' Motion for Summary Judgment in part and deny it in part, as set forth in the accompanying order.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
JAMES S. PAVLICHKO, SR.,          :      NO. 2:02-cv-2889-WY
as guardian ad litem for          :
minor child,                      :
JAMES S. PAVLICHKO, JR.,          :
              Plaintiff           :
                                  :
        VS.                       :
                                  :
GLEN MILLS SCHOOL,                :
COSIMO D. FERRAINOLA, DIRECTOR,   :
LARRY LAURENCE, COUNSELOR,        :
GREG FRAZIER, STAFF MEMBER,       :
JIM WELSH, STAFF MEMBER,          :
TODD DONAHUE, STAFF MEMBER,       :
T.J. GREEN, STAFF MEMBER,         :
MR. YANEZ, STAFF MEMBER,          :
              Defendants          :
```

ORDER

AND NOW, this            day of *October*, 2003, upon consideration of defendants' Motion for Summary Judgment and plaintiff's response thereto, it is hereby ORDERED that the motion is GRANTED IN PART and DENIED IN PART as follows:

1.  Defendants' Motion for Summary Judgment is GRANTED as to defendants Cosimo D. Ferrainola, Larry Laurence, Greg Frazier & Todd Donahue and they are DISMISSED from the lawsuit;

2.  Defendants' Motion for Summary Judgment regarding the retaliation claim (Count I) is GRANTED as against defendants T.J. Green and Nelson Yanez, but is DENIED as against defendants Glen Mills School and James Welsh;

3.  Defendants' Motion for Summary Judgment regarding the conspiracy claim (Count II) is GRANTED;

4.  Defendants' Motion for Summary Judgment regarding the Eighth Amendment claim (Count III) is GRANTED;

5.   Defendants' Motion for Summary Judgment regarding the state law assault and battery claims (Counts IV and V) is DENIED;

6.   Defendants' Motion for Summary Judgment regarding plaintiff's request for punitive damages is GRANTED as to defendant T.J. Green and DENIED as to defendant James Welsh.

It is so ORDERED.

BY THE COURT:

_____
CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE